STATE v. DEWEY.

No. 2359. Decided September 28, 1912 (127 Pac. 275).

1. HOMICIDE—FIRST DEGREE MURDER—EVIDENCE—SUFFICIENCY. Evidence *held* to sustain a conviction of first degree murder. (Page 543.)

2. CRIMINAL LAW—INSTRUCTIONS—REFUSAL. In a murder trial, refusal to instruct that accused could not be convicted if he did not intend to shoot, and if the shooting was accidental, and caused by decedent's attempt to take the gun from him, was not justified by the giving of abstract instructions that an accidental homicide is excusable, etc. (Page 543.)

3. CRIMINAL LAW—CONCRETE INSTRUCTIONS—RIGHT TO. Accused is entitled to concrete instructions, if they are requested, though abstract ones have been given.[1]  (Page 543.)

4. CRIMINAL LAW—HARMLESS ERROR—INSTRUCTIONS—EFFECT OF DRUNKENNESS. Under Comp. Laws 1907, sec. 4070, which provides that an act is no less criminal because committed while accused was intoxicated, but that his intoxication may be considered on a question of motive, it was prejudicial error to instruct, in a murder trial, that evidence of drunkenness was admissible only on the question of premeditation, followed by instructions that in cases of premeditated murder drunkenness is immaterial.  (Page 545.)

5. HOMICIDE—MURDER—BURDEN OF PROOF. Though Comp. Laws 1907, sec. 4856, provides that on proof of a homicide accused has the burden to show mitigation, justification, or excuse, it was error to instruct that "presumptively every killing is murder," since the burden to prove malice and intent to kill was on the prosecution; the statute merely requiring accused to produce sufficient evidence of justification or excuse to create a reasonable doubt as to whether the homicide was justified or excusable.[2]  (Page 550.)

6. HOMICIDE—MURDER—INTENT AND MALICE—PROOF. To convict of murder, it is not essential that intent and malice be shown by direct evidence. They may be presumed from the fact of the killing where no attendant and explanatory facts and circumstances are shown, and where the attendant facts and circumstances of the killing are shown they may be inferred.  (Page 550.)

McCARTY, J., dissenting in part, and concurring in part.

APPEAL from District Court, Third District; *Hon. F. C. Loofbourow,* Judge.

.Elmer L. Dewey was convicted of first degree murder, and he appeals.

REVERSED AND REMANDED.

---

[1] Shepherd v. Railroad Co., 41 Utah, 469, 126 Pac. 692.

[2] State v. Vacos, 40 Utah, 169, 120 Pac. 497, modifying, if not overruling, People v. Tidwell, 4 Utah, 506, 12 Pac. 61; People v. Callaghan, 4 Utah, 49, 6 Pac. 49, and People v. Dillon, 8 Utah, 92, 30 Pac. 150.

*C. S. Price* for appellant.

*A. R. Barnes* Attorney-General, and *E. V. Higgins* and *George C. Buckle,* Assistant Attorneys-General, for the State.

STRAUP, J.

Defendant was convicted of first degree murder, sentenced to life imprisonment, and appeals. The principal questions relate to the court's charge.

The defendant is about twenty-seven years of age. At the time of the homicide he was in the employ of the Pinkerton Agency as a detective. He had been married three or four years. For a year or more prior to the homicide, he and his wife had considerable trouble and numerous quarrels, chiefly on account of attentions the defendant claimed other men gave his wife. They roomed at hotels and apartments, separated several times, reunited, and again separated. A day or two before the homicide, the defendant attempted another reconciliation. She refused to longer live with him, and took rooms at a hotel separate and apart from him. On the night of the homicide, he, after midnight, entered his wife's room, and, as shown by the evidence on behalf of the state, created a disturbance by loud talking, cursing, and swearing, and flourishing a revolver. Attendants at the hotel rapped on the door and requested him to be quiet. They also telephoned to the police station. A guest of the hotel, who had met the defendant and drank with him in the evening, and who was attracted or disturbed by the noise, went to the door of the room where the defendant and his wife were, heard him swearing and cursing and calling her names, and heard her say, "please don't point that gun at me." The guest rapped on the door, told the defendant who he was, and asked him to quiet down. The defendant hesitated in opening the door, stating that he did not know whether the guest was the person whom he represented himself to be or a "cop," and threatened to kill the first person who entered the room. He finally opened the door, but at the same time pointed a loaded revolver at the guest, commanding him to

"throw up" his hands, and bade him enter. The guest did so. The defendant had no clothes on, except a small undershirt. The wife, in her night clothes, was in bed. The defendant was agitated, excited, and under the influence of liquor. The guest succeeded in quieting him, and persuaded him to lay the gun on the dresser. The wife attempted to get it, but the defendant reseized it before she got hold of it. Shortly thereafter the deceased, a policeman, and two other policemen, entered the room. The deceased walked by the guest and toward the defendant, and, addressing him, said, "What is the trouble?" As further shown by the state, the defendant replied: "There is no trouble." At that, without provocation or warning, the defendant suddenly drew the gun, held by him behind his leg, and shot the deceased, who then was but three or four feet away. The deceased lunged forward, grabbed the gun, and in the struggle both fell to the floor. The other two policemen beat the defendant on the head and face, and disarmed him. The officers testified that while the defendant showed evidence of being somewhat under the influence of liquor, or of recently having drunk intoxicants, he nevertheless well knew what he was doing and understood all that was said to and by him. Five or six hours thereafter the defendant, at the police station, was interviewed by press reporters. To them, upon questions propounded to him, he related his domestic trouble, told them of his wife's infidelity, their separations and reunions, his excessive drinking of intoxicants, their final separation, and his wife's refusal to longer live with him, his infatuation for her, his pleadings and entreaties that she go with him to reside elsewhere, where her environments would be different, his drinking intoxicants all day and all night up to shortly before the homicide, and his resolve to enter his wife's room, kill her, and then kill himself. He told them that he remembered going to her room, that, in a vague way, he remembered that some sort of a struggle took place there, but that he had no recollection of shooting the deceased, nor that the gun was discharged, nor that the policemen had beat and disarmed him, and that he had no knowledge that the deceased

had been shot until his wife, shortly before the interviews
with the reporters, told him of the occurrence.

The defendant was a witness in his own behalf, and in
detail related his domestic trouble, his mental distress, his
excessive drinking of liquors during their trouble, and his
lack of all memory of shooting the deceased, substantially as
he related those things to the reporters. He further testified
on the morning of the day preceding the homicide he drank
a bottle of gin, and during the day and night before the
homicide much whisky and other intoxicants, and that just
before entering his wife's room he imagined mad dogs on
the street attempting to pursue him, but held back by ropes,
and that he fled from them. Several witnesses testified that
they saw the defendant drinking much liquor on the after-
noon and night before the homicide; that he was drunk, and
acted wildly, and talked incoherently. His wife testified
that he entered her room very drunk, greatly agitated and
excited, and that he fell on the floor and with difficulty arose
and undressed himself; that he crawled on his hands and
knees with the gun in his hand, peered under the bed, stared
at her, acted wildly, made some disturbance, placed the re-
volver under the pillow, and, as she attempted to get it, re-
seized it and flourished it; and that when the deceased en-
tered the room, and walked toward the defendant, and at-
tempted to take the gun from him, a struggle ensued, and that
the gun was accidentally discharged. She testified that the
defendant for some time drank excessively, and she and a
physician testified that about six months prior to the homi-
cide the defendant was in a state of acute delirium tremens
and was taken to a hospital. Two physicians, on behalf of
the defendant, on hypothetical questions submitted to them,
testified that the defendant at the time of the homicide was
in a state of delirium tremens or alcoholic insanity, and in
their opinion was then irresponsible. A physician, for the
state, on a hypothetical question submitted to him by the
state, testified that in his opinion the defendant was not
then suffering from such or other mental derangement, and
that he was responsible for his acts and conduct; but, on a

hypothetical question submitted to him by the defense, testified that in his opinion the defendant was suffering from alcoholic insanity and was irresponsible at the time of the homicide.

The state, upon the evidence adduced by it, contended that the defendant willfully and deliberately shot the deceased, and that he was guilty of first degree murder. There is, of course, sufficient evidence to justify such a conclusion and to support the verdict as rendered. On the other hand, the defendant sought to excuse or alleviate the charged homicide on the grounds: (1) That in the deceased's attempt to disarm the defendant the gun was accidentally and unintentionally discharged; (2) that at the time of the homicide the defendant, because of his deep intoxication, was incapable of deliberation and premeditation, or of forming or entertaining the design or intent to kill; and (3) because of his mental condition, due to delirium tremens or alcoholic insanity, he was bereft of reason and understanding and incapable of comprehending or controlling the act committed by him.

In accordance with the first theory, the defendant requested the court to charge: "If the jury believe from the evidence there was no intentional shooting, and that the defendant did not, at the time the shot was fired, point the gun at the deceased, or intend to fire the shot from the pistol that resulted in the death of the deceased, but that the same was accidentally fired while the deceased was attempting to take the gun from the possession of said defendant, then you cannot find the defendant guilty. In determining whether or not the deceased was accidentally shot, you have the right to take into consideration, in determining this fact, the situation of the parties, the condition of the defendant's mind at the time in question, their relation to each other at the time the shot was fired, the position of the defendant at the time with respect to the position of the deceased, and the place where, and the manner in which, the fatal wound was inflicted, and all other circumstances surrounding the parties at the time the shot was fired." This

the court refused, by stating that it was "given in sub- stance." There is some evidence to render such a charge applicable. The facts embodied in the request were in sub- stance testified to by the defendant's wife. Whether her testimony was true or false was a question for the jury. The defendant was entitled to a submission of the case on such theory. This the state does not dispute. It contends, how- ever, that the substance of the request was given. It was refused by the court, not because of a belief that there was no evidence to render it applicable, but for the reason in- dorsed on the request, "given in substance."

The court evidently thought that there was some evidence calling for a charge on the subject. With that conclusion we assent. The further inquiry, therefore, is: Was the prop- osition correctly stated in the request; and, if so, was it in substance given? The first is not disputed; the second is. What the court charged is that homicide is excusable "when committed by accident and misfortune in doing any lawful act by lawful means with usual and ordinary caution and without any unlawful intent," and that "an accident is an event happening without the concurrence of the will of the person by whose agency it was caused; it is an event which takes place without one's direct intention; and when a hom- icide appears to be excusable, as defined above, the person in- dicted cannot be convicted of any degree of crime." Ab- stractly, the proposition is well stated. But the duty of the court is not always discharged by merely giving the jury an abstract and lexical definition of a thing, as was done here. Litigants are entitled to have the court declare the law ap- plicable to the particular facts of the case; to charge con- cretely, not abstractly. A charge which applies the law to the facts of the case, and states to the jury the crucial ques- tion or questions involved, which they, upon the evidence, must answer, is much more helpful to them, and conduces far more to a just administration of the law, than mere ab- stract propositions of law, dissertations on sound theories, or lexical definitions of things, concerning the application of which the jury are left in doubt or allowed to make as

they might think proper. Wholesome observations on this are made by the Chief Justice in the recent case of *Shepherd v. Railroad Co.*, 41 Utah, 469, 126 Pac. 692. The general and abstract charge as here given applies as well to different facts of a hundred or more cases as to the one in hand. We think the defendant was entitled to a charge substantially as requested, and that it was not given.

We need not determine whether the ruling refusing the request and charging as was done was such a prejudice as to call for a reversal, for we think the complaint made of the following charge is more serious and prejudicial. The court charged: **4**

"(20) If you should find that the defendant fired the shot in question, and that, when he did so he was drunk, the fact of his being drunk, if you find it to be a fact, does not render the act less criminal, and in that sense it is not available as an excuse; but there is nothing in this to exclude drunkenness as evidence upon the question as to whether the act was deliberate and premeditated. Presumptively, every killing is murder; but, so far as the degree is concerned, no presumption arises from the mere fact of killing, considered separately and apart from the circumstances under which the killing occurred. The question of degree is one of fact, to be determined by the jury from the evidence in the case, and drunkenness, as evidence of a want of premeditation, may properly be considered. Drunkenness neither excuses the offense nor avoids the punishment which the law inflicts, when the character of the offense is ascertained and determined, but evidence of drunkenness is admissible with reference solely to the question of premeditation. In cases of premeditated murder the fact of drunkenness is immaterial. A man who is drunk may still act with premeditation, as well as a sober one, depending upon the degree of intoxication, and may be equally responsible for the consequences of his act. In murder in the first degree, it is necessary to prove the killing was premeditated, which involves, of course, an inquiry into the state of mind under which the

41 Utah—35

party committed it, and in the prosecution of such an inquiry his condition, as drunk or sober, is proper to be considered. The weight and effect to be given to it is a matter for the jury to determine, and it is sufficient for the court to say to the jury that it should be received with caution, and carefully examined in connection with all the circumstances and evidence in the case."

The court also charged the jury that if they, from a deliberation upon the whole of the evidence submitted to them, entertained a reasonable doubt as to whether the defendant at the time of the homicide was suffering from alcoholic insanity or delirium tremens to the extent that he was incapable of distinguishing between right and wrong, and of comprehending the nature and quality of the act committed by him, they should acquit him. The jury evidently believed and found that the defendant was not so suffering from such mental derangement, and found that issue against him; and there is evidence to justify such a finding. But in the quoted charge we think the court too much restricted the jury's consideration of the evidence of the defendant's drunkenness, and stated the law in that regard rather misleading, conflicting, and to his prejudice. The evidence in respect of the extent of the defendant's intoxication at the time of the homicide is conflicting. There is, however, considerable evidence to show that he then was drunk, agitated, and excited.

We have a statute (Comp. Laws 1907, sec. 4070) which provides:

"No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act."

The charge which the court gave is not as broad as the statute. In one portion of it the court told the jury that drunkenness could be considered in determining "whether the act was deliberate and premeditated;" and in another, "evidence of drunkenness is admissible with reference solely to the question of premeditation;" and then, immediately following this, the jury were told that "in cases of premeditated murder the fact of drunkenness is immaterial," not that drunkenness is immaterial, if the jury found that the defendant with malice and premeditation committed the homicide, but that in all "cases of premeditated murder the fact of drunkenness is immaterial;" and then the court admonished the jury that in first degree murder it was necessary to prove premeditation, and that that involved the "inquiry into the state of mind" of the defendant, and for that purpose "his condition, as drunk or sober, was proper to be considered." It is difficult to see just what the jury understood or what idea they got from all this. By some portions of the charge they would understand that they could consider the fact of drunkenness solely upon the question of premeditation. Then they were told that "in cases of premeditated murder the fact of drunkenness is immaterial." If the jury followed the first direction, they were misled; for that portion of the charge restricted the jury's consideration of drunkenness more narrowly than the statute, which provides that the jury may consider the fact of drunkenness, not "solely to the question of premeditation," but "in determining the purpose, motive, or intent with which he committed the act," in cases where the existence of a particular purpose, motive, or intent is a necessary element to constitute a particular species or degree of crime, as is the case in the charged offense.

Independently of a statute, it is the general rule that, while voluntary intoxication does not excuse crime, and is usually not a defense thereto, yet such condition of the accused at the time of the commission of the offense may be considered in determining the purpose, motive, or intent, where these elements become a material question of inquiry.

And where one is charged with the commission of first de-
gree murder, involving a specific intent to commit the crime
of homicide, the accused may show, in order to reduce the
degree of the offense, that he was in such a state of volun-
tary intoxication at the time of the commission of the crime
as to be mentally incapable of forming the necessary intent,
or of entertaining or forming a design to take life, and as
bearing on the existence or nonexistence of malice, and to
explain and determine the accused's conduct with reference
to the design, purpose, motive, and intent with which the act
was committed. (Extended notes to cases in 13 L. R. A. (N.
S.) 1024, and 36 L. R. A. 470; 12 Cyc. 172; 21 Cyc. 674, and
cases there cited.) This, in effect, is what the statute de-
clares. The charge abridged it, and deprived the defendant
of the full benefit of it.

When the court told the jury that "in cases of premed-
itated murder the fact of drunkenness is immaterial," the
court, if it did not give them a wholly incorrect principle,
gave them a charge which is misleading and apparently in
direct conflict with other portions of the charge. If by the
language used the court meant what it fairly implies, and
what the words ordinarily convey, that portion of the charge
is erroneous. If, on the other hand, the court meant to ex-
press the thought that, though the defendant at the time
of the commission of the offense was drunk, yet if the jury
believed beyond a reasonable doubt that he was not so drunk
as to be incapable of deliberation and premeditation, and of
forming or entertaining a specific intent or design to take
life, and that he willfully, deliberately, with malice afore-
thought, and with the specific intent or design to take the life
of the deceased, shot and killed him, the fact of drunken-
ness was immaterial, then the court did not, by the language
referred to, use language which fairly or reasonably conveys
that meaning. The court here dealt with the subject of the
defendant's voluntary intoxication, and directed the jury the
purpose for which it could be considered by them in deter-
mining the defendant's guilt of the charged offense. Again,
if by the charge the court meant that drunkenness was imma-

terial, if the jury found that the defendant committed "premeditated murder," then such a charge is incongruous; for in determining whether the defendant committed "premeditated murder," the jury had the right to consider the fact of the defendant's intoxication in connection with all the other evidence. The jury should not be invited to determine, without considering the fact of drunkenness, whether the accused committed premeditated murder, and after having so determined, and so ascertained the character of the offense, then to consider drunkenness, and regard it as immaterial. As well let a jury determine the defendant's guilt as charged, and make up their verdict, and then consider his evidence in excuse or mitigation, and disregard it as immaterial, because the verdict is made up.

True, in other portions of the charge the jury were instructed:

"(16) Whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act."

Here the court left it to the jury to determine whether the existence of a particular purpose, motive, or intent was a necessary element of the charged offense, and then, in paragraph 20, directed them that "in cases of premeditated murder the fact of drunkenness is immaterial," and that "evidence of drunkenness is admissible solely to the question of premeditation." Thus, when the charged is looked at as a whole, it is conflicting, misleading, and confusing, as to the purpose for which the jury could consider the defendant's condition of voluntary intoxication, if they found he was in such condition at the time of the homicide.

We think the court was also unfortunate in paragraph 20 by charging the jury, in connection with the subject there charged on, that "presumptively every killing is murder." On a trial for murder, the burden of proving malice and an intent to kill is on the prosecution. That burden does not

shift, but remains with the prosecution through- **5, 6**
out the trial. Of course, it is not essential that the
intent and malice be shown by direct evidence. They may
be presumed from the fact of the killing, where no attend-
ant and explanatory facts and circumstances are shown; and
where the attendant facts and circumstances of the killing
are shown, they may be inferred as inferences of fact. There
is abundant authority for holding that where the killing is
proved, and no accompanying circumstances appear in evi-
dence, the law presumes that the killing was done maliciously.
But the law in this country is also about as well settled that,
where the attendant facts and circumstances of the killing
"are shown in evidence, whether on the part of the prosecu-
tion or the accused, the character of the killing is to be de-
termined by considering them, and it is then not a matter for
presumption which operates in the absence of explanatory
evidence, but for determination from the circumstances
shown in evidence." (21 Cyc. 875-880, and cases there
cited.) Here the attendant facts and circumstances of the
killing were shown in evidence, both by the prosecution and
the defendant. The inferences to be drawn and found from
them as to intent and malice, under such circumstances, were
inferences of fact "which the jury must draw, if such seems
to them to be their duty, and not one of law, which the court
may impose upon their deliberation, and then upon that as-
sumption shift the burden upon the prisoner, and require him
to prove that no crime has in fact been committed." (*Peo-
ple v. Downs,* 123 N. Y. 558, 25 N. E. 988.) To the same
effect are: Wharton on Homicide (3 Ed.), p. 220; *Lucas
v. State,* 78 Neb. 454, 111 N. W. 145; *Kennison v. State,*
80 Neb. 688, 115 N. W. 289; *Territory v. Lucero,* 8 N. M.
543, 46 Pac. 18; *Territory v. Gutierrez,* 13 N. M. 138, 79
Pac. 716; *Raines v. State,* 81 Miss. 489, 33 South. 19;
*Stokes v. People,* 53 N. Y. 164, 13 Am. Rep. 492; 2 Cham-
berlayne, Modern Evidence, 1137 *et seq.*

But it is said that, because of our statute (Comp. Laws
1907, sec. 4856) and the holding of our territorial courts
(*People v. Tidwell,* 4 Utah, 506, 12 Pac. 61; *People v. Cal-*

*laghan,* 4 Utah, 49, 6 Pac. 49; and *People v. Dillon,* 8 Utah, 92, 30 Pac. 150), the charge in such particular is proper. The section reads:

"Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, shall devolve upon him, unless the proof on the part of the prosecution tends to show that the crime committed amounts only to manslaughter or that the defendant was justified or excusable."

The territorial courts, in the cases referred to, held that under the statute, upon proof of the killing, without a showing by the prosecution of circumstances in excuse, mitigation, or justification, the burden of proof, the *onus probandi,* shifts to the defendant to prove by a fair preponderance of the evidence facts in mitigation, excuse, or justification; that is, in cases where the issue of self-defense, insanity, or any other defense of excusable or justifiable homicide is raised and relied on by the defendant, he, in order to avail himself thereof, is required to prove it by a fair preponderance of the evidence, a clear shifting of the burden of proof. Even though such an interpretation of the statute should be adopted, still the charge referred to is not justified in a case where, as here, the attendant facts and circumstances of the killing are shown and are in evidence; for, as already pointed out, when such is the case, the inferences of intent and malice and the character of the killing are to be determined as matter or inferences of fact, from a consideration of all the facts and circumstances in evidence, and not upon legal presumptions operating in the absence of explanatory evidence. And in such case it is not proper, nor justifiable by the statute, for the court, as was here done, to impose on the deliberation of the jury the legal presumption, and require them to presume a murder from the bare fact of the killing, regardless of the attendant facts and circumstances in evidence.

But these early territorial cases have been greatly modified, if not repudiated, by this court in the very recent case of *State v. Vacos,* 40 Utah, 169, 120 Pac. 497. In that case

.Mr. Chief Justice Frick, having the statute referred to under consideration, and after reviewing the Utah and California cases, said:

"We are clearly of the opinion, therefore, that in any case coming within the purview of section 4856 the duty or burden is cast upon the defendant to produce or bring forward the evidence in support of justification or excuse; but he is not required to establish the justification or excuse by a preponderance of the evidence before he is entitled to avail himself of that defense. All that he is required to do is to produce sufficient evidence of justification or excuse, which, when considered with all the other evidence in the case, will create a reasonable doubt in the minds of the jurors whether the homicide in question was justified or excusable or not."

We think this a correct statement of the law, and the proper interpretation of the statute. It was concurred in by a unanimous court, while the territorial cases were by a divided court. The opinion clearly points out the distinction between "burden of proof," the *onus probandi,* the necessity of establishing the existence of a fact or a proposition by. evidence which preponderates to a legally required extent as against all counter evidence, and "burden of evidence," the necessity of mere duty of proceeding or going forward and producing or bringing forward evidence in support of a proposition of fact. It is the latter, and not the former, which the statute casts on the defendant—not the necessity of establishing a justification or excuse as against presumptions or counter evidence, but the duty of proceeding or going forward and producing or bringing forward evidence of justification or excuse, when the commission of the homicide by the defendant is shown, without explanatory or attending circumstances. The burden of proof, however, to show malice, and a willful and intentional killing, and every other element necessary to constitute the charged offense, at no stage of the proceeding shifts, but remains with the prosecution throughout the trial; and if upon the whole of the evidence, including that produced by the defendant, or the circumstances in mitigation, justification, or excuse brought

forward by him, or otherwise shown in evidence, the jury entertain a reasonable doubt as to the defendant's guilt of any element necessary to constitute the charged offense, or one included therein, the defendant is entitled to an acquittal. The charge that "presumptively every killing is murder" was intended to give, and did give, the jury to understand that "presumptively" the killing of the deceased by the defendant was murder, regardless of the attending facts and circumstances connected with the killing and shown in evidence, and, in the language of the court in the case of *People v. Downs, supra,* had the effect "to shift the burden of proving his defense upon the prisoner, and deprived him as to that defense of the benefit of a reasonable doubt," and to give the jury to understand "that a conviction must follow unless the prisoner justified or excused the act, and that to secure acquittal he must be able to show a legal justification or excuse, and the jury must reach that conclusion if it would acquit." In other words, notwithstanding the attendant facts and circumstances shown in evidence of the killing, the court, nevertheless, imposed upon the deliberation of the jury the legal presumption, and required them to assume murder from the bare fact of the killing of the deceased by the defendant, from which a conviction would naturally follow, unless the defendant, to the satisfaction of the jury, had successfully met or overcome the presumption, thus shifting and casting on him, not the "burden of evidence," but the "burden of proof"—a doctrine repudiated by the Vacos Case. We think the judgment of the court below should be reversed, and the case remanded for a new trial. Such is the order.

FRICK, C. J., concurs.

McCARTY, J. (concurring in part, and dissenting in part).

E. L. Penrose, one of the press reporters who interviewed the defendant a few hours after the homicide in question took place, was called as a witness by the defendant, and in his direct examination testified that at that interview he

asked the defendant "to detail the occurrences of the shooting." In response to this request the defendant, in the presence of R. L. Shannon, a police officer, told the witness and another newspaper reporter of his own domestic troubles and of his drinking of intoxicants during the day prior to the homicide. As the defendant's statements on that occasion regarding these matters are referred to somewhat in detail by Mr. Justice Straup in the foregoing opinion, further reference to them here is unnecessary. The witness further testified that the defendant said that when he went to his wife's room on the night of the homicide he intended to kill her and then kill himself; that he entered the room and partly undressed therein; that "he said he remembered laying the revolver on the dresser, and then taking it up, and his wife said, 'Don't point that thing at me,' and then about that time some one entered the room, . . . and he picked up the revolver, and that was about all he could remember. He remembered that he had the revolver in his hand, that it was cocked, but did not remember pointing it at anyone, nor of pulling the trigger, but the next he knew he and Sergeant Johnston (the deceased) fell to the floor together." The witness also testified that at the time of the interview he was of the opinion that "the defendant's mind was in anything but a normal condition;" that his impression at the time was that the defendant was insane. On cross-examination, the witness said that his reason for believing the defendant insane was his pallor and nervousness, that in relating what he claimed to be the facts and circumstances leading up to and surrounding the homicide the defendant would frequently hesitate and "apparently tried to remember things that he could not remember," that "he started to answer questions at times, and then stopped and said that he did not recall." On redirect examination the witness said that the defendant's physical appearance indicated that he had been "drinking excessively;" that his eyes were "glassy and expressionless." Mr. Shannon, a witness for the state, who was present at this interview, testified that the defendant "seemed to be unusually cool and delib-

erate in his talk;" that he "talked very freely (and) did not appear to have to stop and think of anything." It seems that the defendant on that occasion did not mention the delusion or hallucination which he claimed at the trial he was laboring under just before he entered his wife's room on the night of the homicide. The jury, therefore, no doubt believed, and they were justified in believing, that that was an afterthought on the part of the defendant, conceived for the purpose of enabling him to avoid the consequences of his act in taking the life of Sergeant Johnston.

Coming, now, to what occurred in Mrs. Dewey's room just prior to and at the time of the homicide, the evidence without conflict shows that when a man by the name of Campbell knocked on the door the defendant requested Mrs. Dewey to open the door, and that Mrs. Dewey replied that she would not open the door "as long as the gun was pointed that way;" that the defendant then said, "I want to see whether it is a cop or not," and that he would kill the first son of a —— that came in the room, and if a cop came he would kill him, too. Mr. Campbell said: "This is not a cop; this is Mr. Campbell, your friend." The door was then opened, and the defendant pointed the gun at Mr. Campbell who entered the room "with his hands up." Mr. Campbell succeeded in partially pacifying the defendant. The defendant then placed the gun on the dresser. Mrs. Dewey started toward the dresser to get possession of the gun. The defendant observed her movement, picked up the gun, and retained possession of it until Sergeant Johnston, together with two other policemen, entered the room a few minutes thereafter.

Up to this point there is but little, if any, conflict in the evidence regarding what was said and done by the defendant. Mr. Campbell and the two policemen who were with Sergeant Johnston at the time of the shooting were called as witnesses by the state, and each of them testified that when Johnston entered the room he walked towards the defendant and said, "What's the trouble here?" that the defendant said, "There is no trouble," and drew the gun from behind his leg, where he had it concealed, and shot Johnston; that John-

ston grabbed the gun, and in the struggle that ensued he and the defendant fell to the floor. On this point Mr. Riley, one of the police officers who assisted in disarming the defendant, testified on cross-examination in part as follows: "Q. After they were lying on the floor, the gun was taken from Mr. Dewey by Mr. Sullivan? A. Yes, sir. Q. Did Mr. Dewey and Mr. Johnston scuffle for the gun? A. They did. Q. And they were trying to get it—Mr. Dewey trying to prevent Mr. Sullivan from taking the gun? A. He was trying to prevent him. Q. Mr. Dewey? A. Certainly he was. Q. And he had quite a scuffle over it? A. Yes." Regarding the condition of the defendant with reference to being drunk or sober, Mr. Riley testified as follows: "Q. Would you say that he had been drinking very heavily? A. No; I don't think I should say he had been drinking very heavily; no. Q. Didn't he appear to you to be a man out of his mind? A. He did not; no, sir. Q. He appeared wild, didn't he? A. Not to me, he did not. Q. Would you say that he was not intoxicated? A. Well, I would not say that. I would say that he had been drinking, but not what you would call intoxicated. Q. Would you say that he was in such condition that he could walk erect without staggering? A. Yes, sir. Q. You are positive he was in that condition? A. He could walk all right. Q. Without staggering? A. Yes, sir."

Mr. Campbell testified that when he entered the room on the occasion in question the appearance of the defendant indicated that "he had been drinking;" that "he looked awful mad." In answer to the question, "Does a sober man, a man in possession of his mental faculties, usually look like Mr. Dewey did that night?" the witness answered, "No; as I say, he had been drinking, and he stared at me—looked right straight at me all the time." Mrs. Dewey testified that when Johnston entered the room the defendant was holding the gun in his hand; that it was cocked. She further testified: "Q. Now, what did Mr. Johnston do, if anything, when he entered the room? A. He looked at me and said, 'What's the trouble here?' and then he looked at

Dewey, and saw the gun, and he made a dive for the gun.
. . . Q. Did they stand on their feet then, or what did
they do? A. He jerked it, and they both fell to the floor on
their knees. Q. When did the shot go off? A. When he
jerked it and fell to the floor, the shot went off. . . .
They were mixed up on the floor. They fell flat down on
the floor, and they both had hold of the gun. Mr. Johnston
had hold of the gun, and so did my husband, and they both
laid flat on the floor. . . . They fell to the floor, and
the gun went off. . . . Q. It went off after it struck
the floor? A. They fell to the floor on their knees some way.
Q. Before the gun went off? A. Yes, sir." The evidence
shows that the gun, when taken from the defendant, was
cocked, and in its cylinder were several undischarged cart-
ridges.

The jury having, by their verdict, found, and the evidence
fully justified the finding, that the defendant was sane and in
possession of his faculties when he fired the fatal shot, we
have a case in which the evidence tends to show that the
accused, after having become somewhat intoxicated, went to
his wife's room at the Albert Hotel with the intention of
killing—murdering—his wife; that on entering the room
he commenced quarreling with his wife, became very angry,
drew and flourished a revolver, and abused his wife by curs-
ing and swearing at her and calling her vile names; that
several guests of the hotel were disturbed by the defendant's
boisterous conduct, and went to the room in which he was
making the disturbance; that these guests heard the defend-
ant's wife say to him, "Please don't point that gun at me;"
that the police were notified of the disturbance and requested
to come to the hotel and restore order; that one of the guests,
Mr. Campbell, knocked at the door of the room in which
the defendant was swearing at and calling his wife vile
names; that the defendant thereupon threatened to kill the
first person who entered the room, and that if a "cop" came
in he would "kill him, too;" that Mr. Campbell was admitted
to the room, and as he entered the defendant pointed a gun
at him and commanded him to hold up his hands, which

Campbell did; that the defendant became somewhat pacified and lowered his gun, and a few minutes thereafter Sergeant Johnston and two other policemen entered the room. Johnston stepped towards the defendant and said, "What's the trouble here?" and the defendant answered, "There is no trouble."

As hereinbefore pointed out, there is a conflict in the evidence as to whether the defendant shot before Johnston grabbed the gun or after. Sullivan, Riley, and Campbell all testified that the defendant shot before Johnston got to him. Mrs. Dewey testified that the gun was discharged after Johnston had seized the muzzle end, the barrel of the gun, and he and the defendant had fallen to the floor in the scuffle for the possession of the weapon. As I read the record, the evidence when viewed in the light most favorable to defendant, does not support or tend to support the theory, advanced in behalf of defendant, that the shooting was accidental. The claim made that the shooting was accidental is based on the testimony of Mrs. Dewey, that the defendant was intoxicated and that the gun was discharged in a scuffle between Johnston and the defendant for the possession of the weapon. The undisputed evidence shows that the gun, when taken from the defendant, was cocked. This tends to show, if it tends to show anything, that the defendant was endeavoring to shoot Johnston the second time when the gun was taken from him. This circumstance, when considered in connection with the statement, made by the defendant a few hours after the homicide, that he went to the room where it occurred, on the occasion in question, with the intention of murdering his wife, and the further fact that he made threats a few minutes before the officers entered the room that he would kill the first person who came in the room, and if a "cop" came in he would "kill him, too," is entirely inconsistent with the theory advanced that the gun was accidentally discharged. I am therefore of the opinion that the court did not err in refusing to instruct the jury on the theory of accidental shooting, as requested by defendant. The court instructed the jury, in the language of the statute,

that homicide is excusable "when committed by accident and misfortune, *in doing any lawful act by lawful means,* with usual and ordinary caution and *without any unlawful intent.*" (Italics mine.) The court also charged the jury that "an accident is an event happening without the concurrence of the will of the person by whose agency it was caused. It is an event which takes place without one's direct intention." It is not claimed, nor can it be successfully urged, that there is a single fact or circumstance in the case that in anyway tends to show that defendant was "doing a lawful act by lawful means" when the shot that killed Sergeant Johnston was fired. But, on the contrary, all the evidence regarding what was said and done by the defendant just prior to and at the time the shooting took place shows that he was resisting an officer who was in the discharge of a duty imposed on him by law. The evidence of Mrs. Dewey shows this. And it is mainly her testimony upon which the theory of accidental shooting is based. The defendant, therefore, according to the undisputed evidence, was committing a felony at the time the shot was fired, because, under Comp. Laws 1907, section 4142, resisting an officer under these circumstances is made a felony. The record, as I read it, no more shows a case of excusable homicide under Comp. Laws 1907, section 4166, than it does a case of justifiable homicide on the ground of self-defense under section 4168. The instructions given by the court on the question of accidental shooting were, in my opinion, much more favorable to the defendant than the facts warranted.

While the great weight of the evidence tends to show that the defendant at the time of the shooting realized and appreciated what he was doing, and fully comprehended the nature and consequences of the act, yet there is evidence (that given by the defendant himself) which, if believed, tends to show that he was under the influence of intoxicants, and was so drunk that he was incapable of forming an intent to injure anyone, and that he did not comprehend or realize what he was doing, or the consequences of the act. He was therefore entitled to have the jury properly instructed regarding the

purpose for which they might consider the fact of his intoxication, if they found it to be a fact that he was intoxicated. The court, among other things, instructed the jury as follows:

"You are instructed that, before you can find the defendant guilty of the act charged, you must be satisfied beyond a reasonable doubt that he entertained a specific intent to commit the act, and that it is just as necessary that the intent be proved as it is necessary to prove the act itself, which intent must be found by you as a matter of fact before a conviction can be had. In considering the question of intent, you should take into consideration the nature of the defendant's acts at the time when the alleged act was committed, and all other circumstances in evidence in the case calculated to throw light upon the intention, including his mental condition at the time in question and whether or not he was mentally capable of entertaining such intent."

On the question of defendant's alleged intoxicated condition at the time of the shooting, and the purpose for which such intoxication might be considered, the court instructed the jury in the language of the statute (Comp. Laws 1907, section 4070) as follows:

"No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act."

The court also charged the jury:

"It is a well-settled rule of law that drunkenness is no excuse for the commission of crime. It does not destroy responsibility when the party, when sane and responsible, made himself voluntarily intoxicated, and drunkenness forms no defense whatever to the fact of guilt; for, when a crime is committed by a party while in a fit of intoxication, the law will not allow him to avail himself of his own gross vice and

misconduct to shelter himself from the legal consequences of such crime; but *evidence of drunkenness can be considered by the jury for the purpose of determining the degree of the crime."*

Up to this point the court correctly charged the jury regarding the purpose for which they might consider the fact, if they found it to be a fact, that the defendant was intoxicated at the time of the homicide. The court, in its instruction No. 20, set out in the foregoing opinion, among other things charged the jury, and I think correctly, that "in murder in the first degree it is necessary to prove that the killing was premeditated, which involves, of course, an inquiry into the state of mind under which the party committed it, and in the prosecution of such inquiry his condition as drunk or sober is proper to be considered. . . . The question of degree is one of fact, to be determined by the jury from the evidence in the case, and drunkenness as evidence of a want of premeditation may properly be considered." But the court unfortunately, and no doubt inadvertently, in that same instruction (No. 20) said: *"In case of premeditated murder the fact of drunkenness is immaterial."* This part of the instruction which I have italicized is not only in direct conflict with the other portions of the instruction which I have set forth, but is in conflict with other portions of the charge on the same question, and, as said by Mr. Justice Straup in the foregoing opinion, "when the charge is looked at as a whole, it is conflicting, misleading, and confusing as to the purpose for which the jury could consider the defendant's condition of voluntary intoxication at the time of the homicide," and the defendant's rights were thereby prejudiced.

I am of the opinion that where, as in the case at bar, the facts and circumstances leading up to and surrounding the homicide are shown, it is prejudicial error for the court to charge, as was done in this case, that "presumptively every killing is murder." I agree with my associates in what is said, and in the conclusions reached by them on this phase of the case. Therefore I concur in the judgment of reversal.