## STATE v. HARRIS et al.

No. 3507.   Decided June 15, 1921.   (199 Pac. 145.)

1. HOMICIDE—EVIDENCE HELD TO ENTITLE DEFENDANT TO FULL INSTRUCTION ON SELF-DEFENSE, DEFENSE OF RELATIVE AND HABITATION, AND KILLING TO PREVENT FELONY.   In a prosecution for homicide, evidence that deceased came to the home of defendant's mother with other men, all of whom were armed, and that deceased attacked the mother and drew his gun just before defendant shot and killed him, entitled defendant to full instructions on self-defense, reasonable belief in existence of imminent peril, defense of a relative, killing to prevent a felony, and a defense of the habitation.

2. CRIMINAL LAW—INSTRUCTION GIVING STATUTORY LANGUAGE ON BURDEN OF PROVING JUSTIFICATION HELD NOT TO JUSTIFY REFUSAL OF REQUESTED INSTRUCTION.   A charge in the language of Comp. Laws 1917, § 8986, that if the killing by defendant has been proved the burden of proving mitigation or justification devolves upon him, unless the proof by the prosecution tends to show mitigation or justification, without defining what is meant by the burden of proving such circumstances, is mislead-

ing and confusing, and the giving of such instruction did not justify the refusal of a requested instruction, explaining that the burden of proof thereby cast on defendant only required him to produce evidence sufficient to raise a reasonable doubt.[1]

3.  HOMICIDE—DEFENDANT NEED INTRODUCE ONLY SUFFICIENT EVI-DENCE OF JUSTIFICATION TO RAISE REASONABLE DOUBT OF GUILT. Comp. Laws 1917, § 8986, providing that if the commission of homicide by defendant has been proved the burden of proving mitigation or justification devolves upon defendant, only requires deendant to introduce evidence of mitigation or justification sufficient to raise a reasonable doubt as to his guilt, but does not require him to establish the facts of mitigation or justification by a preponderance of the evidence.

4.  CRIMINAL LAW—REQUESTED INSTRUCTION ON EVIDENCE OF GOOD CHARACTER OF DEFENDANT HELD CORRECT. In a prosecution for homicide, where the defense had introduced evidence of good character for peace and quietude, a requested instruction that such good character, if proven, is a circumstance to be considered with the other evidence, not only in doutful cases, but also when the testimony tends strongly to establish guilt, and that the jury should give such weight to it as they thought it entitled to, and might regard it as sufficient to create a reasonable doubt in their minds, was correct and should have been given.[2]

5.  CRIMINAL LAW—INSTRUCTION ON EVIDENCE OF GOOD CHARACTER HELD ERRONEOUS. An instruction, requiring defendant to prove good character to the satisfaction of the jury, and then permitting it to be considered with all the other evidence in the case, but adding that if the evidence convinced beyond a reasonable doubt of defendant's guilt the jury must so find, notwithstanding his good character, was incorrect as telling the jury in effect to disregard evidence of good character if the other evidence considered without it established guilt beyond a reasonable doubt.

6.  CRIMINAL LAW—REQUESTED CHARGE ON THREATS BY ONE DE-FENDANT OUT OF PRESENCE OF OTHERS HELD COVERED. A requested instruction in a prosecution of several defendants for homicide that the threats made by one defendant were not to be considered against the other defendants unless the jury

---

[1] *State* v. *Vacos*, 40 Utah, 169, 120 Pac. 497; *State* v. *Dewey*, 41 Utah, 538, 127 Pac. 275.

[2] *State* v. *Brown*, 39 Utah, 140, 115 Pac. 994, Ann. Cas. 1913E, 1.

found there was a conspiracy between the defendants was sufficiently covered by an instruction that, in the event the jury found no conspiracy, any threat by any defendant could not be considered against the other defendants, not present when the threat was made.

7. CRIMINAL LAW—REFUSAL OF CAUTIONARY INSTRUCTION AS TO DEFENDANTS' ORAL DECLARATIONS IS NOT ERROR. In a prosecution for homicide, an instruction that testimony as to defendant's oral declarations or statements should be considered with caution, because subject to imperfections and mistakes, even though it was one which the court in its discretion could have given, merely stated a well-known proposition, so that it was not error to refuse it, especially where the witness who testified to the oral statements admitted on cross-examination that a man was liable to be mistaken as to language used by another.

8. CRIMINAL LAW—INSTRUCTION DEFINING MURDER IN THE SECOND DEGREE HELD SUFFICIENT. An instruction, which, after defining murder in the first degree, defined murder in the second degree as any other homicide which amounts to murder when the person did not deliberately and maliciously conceive a specific intent and meditate upon such purpose, was sufficient, in the absence of a request for a more complete definition of murder in the second degree.

Appeal from District Court, Fifth District, Juab County; *D. H. Morris,* Judge.

Alice Harris, Eugene Harris, and others were indicted for murder and Eugene Harris was convicted of murder in the second degree. The others were acquitted, and Eugene Harris appeals.

REVERSED AND REMANDED, with directions to grant a new trial.

*D. N. Straup* and *E. O. Leatherwood,* both of Salt Lake City, and *T. H. Burton,* of Nephi, for appellant.

*Harvey H. Cluff,* Atty. Gen., and *W. Hal Farr,* Asst. Atty. Gen., for the State.

WEBER, J.

By information Alice Harris, Leland Harris, Eugene Harris, and Edward L. Tackman were jointly charged with murder in the first degree, committed in Juab County on July 22, 1919, by shooting and killing Jesse H. Cone. During the trial, and before it rested, the state dismissed the case against Tackman, who then became a witness for the prosecution. Alice and Leland Harris were acquitted. Eugene Harris, the other defendant, was convicted of murder in the second degree, and sentenced to 20 years' imprisonment. From that judgment he prosecutes this appeal.

In the summer of 1917 Mrs. Alice Harris and her sons Leland and Eugene went to Trout Creek, in Juab County, Utah, and took up some hay land, which thereafter became known as the Harris ranch. Shortly after entering upon the land, Mr. Cone, the deceased, rode to the Harris place, and upon inquiry was told by Mrs. Harris that she had taken up the place. He told her she had better move on. In July following, when Mrs. Harris and her sons returned home from a trip to town, they found that their horses, which had been left in the pasture, had been shut up in the cabin, their wire fences cut, and about 200 head of cattle were pasturing all over the premises. They corralled about 60 head of the cattle, but did not know to whom they belonged. On inquiry, however, the cattle were found to belong to Cone, who called for them in a day or two, declined to pay damages, applied vile epithets to Mrs. Harris, and declared he would take the cattle, and if any one interfered he would kill the whole family, at the same time drawing his gun on Eugene Harris. From that time on until the homicide, during the spring and summer when the grass was growing, cattle were constantly trespassing upon the Harris place, most of the cattle being owned by Cone.

In June, 1919, hay was being cut on the Harris ranch. On Sunday, June 20, fifty of Cone's cattle were found in the hayfields of the Harris ranch. They had tramped down the grass and spoiled hay that had been bunched. Eugene Har-

ris and an employé corralled a number of the cattle about noon of that day. In the afternoon Eugene saw Cone about a quarter of a mile away. He and the employé named Tackman, rode to where Cone was, and notified him that some of his cattle had been corralled and held for damages. Cone was armed as usual, became angry, cursed and swore, called Eugene vile names, struck him several times on the head, and knocked him unconscious to the ground.

On the Tuesday following, the Harrises were working in their hayfield, when one of them discovered a cloud of dust made by approaching horsemen. Eugene recognized Cone among them. Mrs. Harris said she thought they were coming to raid them, got faint, and was assisted to the house. The boys also went into the cabin. Mrs. Harris conceived the idea that, inasmuch as the Harrises had had trouble with Cone, it would be advisable for Tackman, a stranger, to meet Cone and his men. She therefore requested that Tackman meet them at the gate and ask them to disarm. Tackman met Cone and his men, among, whom was a deputy sheriff named Saby, and asked them to disarm. Leland and Eugene and Mrs. Harris remained in the cabin, looking out a screened window. Mrs. Harris overheard the conversation and a statement of Tackman, who posed as a dectective, that he was in the government service, which Mrs. Harris knew to be untrue, and, believing, as she testified, that Tackman was muddling things, she went out. Inside of the gate, a short distance from the horses she met Saby and Tackman, and asked them what the trouble was, or what the fuss was about. Tackman replied that he had asked the men to disarm, that Saby had declined to do so, that he (Saby) had deputized Cone, and that Tackman told him he had no authority to deputize Cone. After further conversation with Saby, who refused to disarm, Mrs. Harris, according to her testimony, told Saby to take the cattle and have no further controversy on the subject. Saby and Tackman then walked away. The story of what then occurred, as testified to by Eugene Harris, is, in brief:

"Mother was standing there at that time. Cone rode forward

and bumped into her and called her a vile name and told her to get out of the way or he would hit her. I grabbed my gun and ran out around the. southeast corner of the house. When I got there I heard mother ask him why he had struck her boy with a crippled hand, and he' reached out, grabbed her by the nose, and said he would cripple her. Mother screamed, broke loose, and turned around and Cone reached for his gun and drew it out, and just then I shot. His horse jumped and swerved. He still had his gun·in his hand. It' looked to me as though he was getting in position to shoot, and I shot again, when Cone fell to the ground. Within a few minutes Cone was dead."

We have detailed enough of the testimony to show that the defendants were entitled to fair and full instructions on the subject of self-defense, which was one of the defenses interposed. A number of instructions were requested on the theory of self-defense. The requests covered various subjects, such as the general law- of self-defense; honest belief in the existence of imminent peril or danger, such belief to be on reasonable grounds; that actual danger is not necessary; that belief and fear must be that of a reasonable man; appearances are to be judged at the time by all the circumstances attending the killing; the right of the defendant to stand his ground; the defense of a relative or member of the family; killing to prevent a felony against another; the defense of habitation, and other essential factors pertaining to the law of self-defense.

The trial court wholly failed to charge as to any of these matters, although in the light of the evidence defendants were entitled to at least the substance of all of them.

Among the requests was this:

"The statute provides that upon a trial for murder, the commission of the homicide being proved, the burden of giving circumstances of mitigation, or that justify or excuse it, shall devolve upon him, unless the proof on the part of the prosecution tends to show that the crime committed amounts only to manslaughter, or that the defendant was justifiable or excusable. But by such language the statute does not, however, mean that to avail themselves of the defense of self-defense that the defendants are required to establish such defense by a preponderance or greater weight of the evidence. It means that, if the evidence on the part of the state does not tend to show it, then the defendants, to avail them-

selves of such defense and to have it considered, are required themselves to bring forward some evidence which tends to show self-defense; if they have done that, and if such evidence of self-defense, when considered in connection with all the other evidence in the case, but raises a reasonable doubt as to the defendants' guilt, or if it but raises a reasonable doubt of whether the defendants did or did not act in self-defense, then you should acquit them."

The request was refused, and the trial court charged in the language of the statute (Comp. Laws Utah 1917, § 8986) as follows:

"You are further instructed that the statute of this state provides that upon such a trial as this, if the commission of homicide by the defendants has been proven by the prosecution, the burden of proving circumstances of mitigation, or that justify or excuse it, shall devolve upon them, unless the proof on the part of the prosecution tends to show that the homicide committed amounts only to manslaughter, or that the defendant was justifiable or excusable."

The requested instruction properly explained what is meant in the statute by "burden of proving circumstances of mitigation," and it was clearly error to refuse it. *State* v. *Vacos*, 40 Utah, 169, 120 Pac. 497; *State* v. *Dewey*, 41 Utah, 538, 127 Pac. 275. The instruction given by the court could not possibly be of any assistance to the jury, but would, in all probability, mislead and confuse the jurors, and induce them to form an opinion that on the question of self-defense the burden of proof shifted to the defendants, and that before they were entitled to an acquittal they must prove self-defense by a preponderance of the evidence. The law is firmly established in this state that when a defendant offers proof of self-defense he is entitled to an acquittal if he has produced sufficient evidence of his justification to create in the minds of the jury a reasonable doubt of his guilt of the offense charged. In the Vacos Case, supra, this court said:

"We are clearly of the opinion, therefore, that in any case coming within the purview of section 4856, the duty or burden is cast upon the defendant to produce or bring forward evidence in support of justification or excuse, but he is not required to establish the justification or excuse by a preponderance of the evidence before he is entitled to avail himself of that defense. All that he is required to do is to produce sufficient evidence of justification or

excuse which, when considered with all the other evidence in the case, will create a reasonable doubt in the minds of the jurors whether the homicide in question was justifiable or excusable or not."

It was further said in the Vacos Case:

"It seems to us that the later California decisions conform 'to both reason and logic. · It certainly must follow, as a logical, if not a self-evident, conclusion, that, if there exists a reasonable doubt in any case whether the accused was justified or excusable in committing a homicide, then there exists a reasonable doubt as to his guilt. It must also be conceded that such a doubt may arise from evidence which falls far short of establishing a justification or excuse by a preponderance of the evidence upon the subject."

In the Vacos Case the erroneous charge was held not prejudicial because in that particular charge the trial court further explained what was meant by the statute as to burden of proof, and that while the court told the jury that the appellant was required to establish justification by a preponderance of the evidence, yet in the same sentence, the court also said that all that was meant by the phrase was that if the evidence created a reasonable doubt in their minds of the guilt of appellant they should acquit him, and because of these explanations of the erroneous statement contained in this instruction it was held not prejudicial.

In *State* v. *Dewey*, supra, the court said that in the Vacos Case—

"the opinion clearly points out the distinction between 'burden of proof,' the onus probandi, the necessity of establishing the existence of a fact or a proposition by evidence which preponderates to a legally required extent as against all counter evidence, and 'burden of evidence,' the necessity of mere duty of proceeding or going forward and producing or bringing forward evidence in support of a proposition of fact. It is the latter, and not the former, which the statute casts on the defendant—not the necessity of establishing a justification or excuse as against presumptions or counter evidence, but the duty of proceeding or going forward, and producing or bringing forward evidence of justification or excuse, when the commission of the homicide by the defendant is shown, without explanatory or attending circumstances."

In the present case, however, the court gave the jury no explanation whatever of the meaning of the statute. Its in-

terpretation was left to the jury, who would naturally draw the conclusion from the term "burden of proof" or "burden of proving" that the defendants were required to prove self-defense by the greater weight of the evidence. It is difficult to conceive how error in the instruction complained of could be harmless.

Other assignments discussed in the brief of appellant's counsel are the refusal to give a requested instruction upon good character, and that the instruction given by the court was erroneous.

Eugene and Leland Harris adduced evidence of good character, and the state introduced evidence to the contrary. The defense requested that the jury be charged as follows:

"Evidence has been given as to good character of the defendants Leland and Eugene Harris for peace and quietude. Such good character, when proven, is a circumstance to be considered by you in connection with all the other evidence in the case in determining the guilt or innocence of the said Leland and Eugene Harris, and is of value, not only in doubtful cases, but also when the testimony tends strongly to establish the guilt of the accused. When such character is proven it is a fact in the case, and should not be put aside by the jury in order to ascertain if the other facts and circumstances considered in themselves do or do not establish the guilt of the said Eugene and Leland Harris, but should be considered by you in connection with all the other testimony in the case, and not independently thereof. When so considering it, you have the right to give such weight to it as you may think it entitled to, and it may be sufficient, if so regarded by you, in connection with all the other evidence in the case, to create a reasonable doubt in your minds as to the guilt of said Eugene and Leland Harris, though no such doubt might exist but for such good character."

The request proposed complied with and is in harmony with the opinions of Justices Straup and Frick in *State* v. *Brown*, 39 Utah, 140, 115 Pac. 994, Ann. Cas. 1913E, 1, and because we think the requested instruction was right in everyway, it is approved once more. In so holding we are in harmony with the prevailing view which is stated in 8 R. C. L. § 223, p. 227, to be that—

"Where evidence of reputation is admissible, its weight should be left to be determined by the jury in connection with all the

other evidence in the case; and it is generally agreed that circumstances ·may be such that an established reputation for good character, if it is relevant to the issue, will alone create a reasonable doubt in the minds of the jury, although without it the other evidence may be convincing."

In 16 C. J. p. 982, it is said:

"It is proper to charge that when the evidence of good character is considered in connection with all the other evidence upon the question of guilt or innocence, it may be sufficient to create a reasonable doubt and to justify an acquittal, when without such evidence no such doubt would exist."

The text is fortified by the citation of numerous cases.

Not only was it error to refuse the requested instruction, but the last proposition in the instruction given was a misstatement of the law. The trial court first required the defendants to prove good character to the "satisfaction of the jury," and that when so proven, it is to be kept in view of all their deliberations, and considered in connection with the other facts in the case; second, that if after a consideration of all the evidence in the case, including that bearing on the good character of the defendant, the jury entertain a reasonable doubt as to the guilt of the defendants, it was their duty to acquit the accused. So far there was no affirmative error in this instruction, but the court added this sentence:

"But if the evidence convinces you beyond a reasonable doubt of said defendants' guilt, you must so find notwithstanding their good character."

This instruction, in effect, told the jury to consider all the evidence in the case except that of good character, and that if they were then convinced beyond a reasonable doubt of the defendants' guilt the evidence of good character should be discarded and disregarded. Proof of good character "must be considered by the jury in connection with all the other testimony, and not independently thereof, and the guilt or innocence of the defendant determined from all the testimony." 8 R. C. L. § 223, p. 228. See, also, notes, 10 A. L. R., commencing at page 8, and page 105, subd. C. Also annotations, *State* v. *Brown,* Ann. Cas. 1913E, 15.

Appeal from Fifth District

An instruction was requested by defendants to the effect that testimony of threats made by Mrs. Alice Harris was admissible to show malice and intent on her part, but not as against other defendants not present when it was claimed such threats were made; that it is undisputed that Mrs. Harris did not shoot and kill deceased, and that, if the jury found there was no conspiracy between her and the other defendants, or either of them, to take the life of deceased or do him great bodily harm, or if such threats, if any, were made before such conspiracy, if any, was entered into, or if such threats were in no way connected with or not in furtherance of any conspiracy, then any threats made by her were immaterial, and should not be considered. The refusal of this instruction was not error for the reason that the court gave an instruction in which the jury were told that in the event they found no conspiracy, any declaration or threat, if any, made by any defendant before the shooting, and not in the presence of the other defendants, or either of them, was admissible, and to be considered against the defendant only making the threats, and not as against the other defendants or defendant not present when made.

It is argued that it was prejudicial error not to give defendants requested instruction admonishing the jury that testimony of witnesses with respect to verbal or oral admissions or statements of parties should be considered with caution, the mere repetition of oral statements being subject to imperfections and mistakes. It is urged that such an instruction should have been given because many witnesses testified to verbal statements made by Mrs. Harris and other defendants, and particular attention is called to the testimony of William A. Parker, who said that in the dark of the evening of July 23, 1919, he heard Eugene Harris, who was then, sitting in the back of an automobile, and whom he did not see, make the statement that they ought to have got four or five more of the s—— of ——b's. Because of this testimony it was within the discretion of the trial court to instruct the jury on the subject of testimony relating

to oral statements as requested by defendant, but it
certainly was not prejudicial error to refuse to tell the
jury what every one knows. Even the witness Parker under-
stood the proposition contained in the refused request when
he said upon cross-examination:

"I recognize the fact that a man is liable to be mistaken as to
language used by one."

Speaking of the refusal to give a requested instruction
that evidence of oral admissions should be received with
caution, the court said, in *People* v. *Raber*, 168 Cal. 316, 143
Pac. 317:

"Such instruction, if not in violation of the constitutional in-
junction against charging juries, on matters of fact, is one that
may properly be refused as a 'mere commonplace.' In short, a
judgment will not be reversed either for the giving or the refusing
of this instruction."

Complaint is made that the definition of second degree
murder in the court's charge was insufficient and incomplete.
After defining murder in the first degree, the court informed
the jury:

"Murder in the second degree is any other homicide which
amounts to murder under the definition I have given you, and yet
when the person committing the act did not, before the fatal blow,
deliberately and maliciously conceive the specific intent unlaw-
fully to take the life of the deceased and meditate upon such
purpose."

We think the jury could readily understand from what
was said by the court about the two degrees of murder that
murder in the second degree is the unlawful killing of
a human being with malice aforethought, but without
deliberation. In the absence of a request for a more
complete definition of murder in the second degree, the charge
of the court on the subject cannot be held to be either insuf-
ficient or incomplete.

Counsel for appellant have discussed a number of other
assignments of alleged error which are not here noticed.
It is sufficient to say that some we regard as without merit,
and others will not occur if defendant is tried again. On
the theory of conspiracy between the defendants much evi-

dence was admitted that will not be offered at another trial. Nor is it necessary to consider the grounds of the motion in reference to newly discovered evidence.

For the reasons stated, the judgment is reversed, and the cause remanded to the district court, with directions to grant appellant a new trial.

CORFMAN, C. J., and GIDEON, THURMAN, and FRICK, JJ., concur.