## STATE v. STENBACK.

No. 5000. Decided September 21, 1931. (2 Pac. [2d] 1050.)

352

*Vere L. McCarthy,* of Salt Lake City, for appellant.

*Geo. P. Parker,* Atty. Gen., and *L. A. Miner,* Deputy Atty. Gen., for the State.

ELIAS HANSEN, J.

The defendant was convicted of murder in the first degree and sentenced to be executed. He appeals. The evidence shows that he is a native of Finland. He came to the United States in 1914, and to Salt Lake City, Utah, in December, 1927. Soon after he arrived in Salt Lake City he purchased a pool hall and restaurant which he conducted until August, 1928. In January, 1928, he became acquainted with Minnie Mantyla, a widow. In August, 1928, the defendant sold his pool hall and restaurant and went to Murray, where he lived with Minnie Mantyla and four of her children on her farm. The defendant and Mrs. Mantyla were never married, but they lived together as husband and wife from August, 1928, until May 18, 1929, when she was killed. During the time the defendant resided with Mrs. Mantyla at Murray, he worked on her farm. About April 1, 1929, Mrs. Mantyla rented the Evans apartment house, which is located on State street in Salt Lake City, Utah. Soon after the Evans apartment was rented, Mrs. Mantyla and the defendant established their residence in a part thereof. The remainder of the apartment house was sublet to others. At about 10 o'clock at night on May 18, 1929, the defendant and Mrs. Mantyla were at home in their rooms in the Evans apartment house. At about that time two of the tenants who occupied rooms on one of the upper floors called at the rooms occupied by Mrs. Mantyla and the defendant for a key. Apparently at that time the defendant and Mrs. Mantyla were feeling kindly toward each other. The tenants secured their key and went to their rooms. In about ten minutes after they went to their rooms they heard the report of several shots and the screams

of a woman. Thereupon they ran down to the rooms occupied by the defendant and Mrs. Mantyla. They knocked on the door, and in a short time the defendant unlocked and opened the door. He was bleeding profusely from his face and head. When he opened the door he said, "Just a minute, just a minute," and then closed the door again. The tenants ran back to their rooms and called the police department of Salt Lake City, Utah. When the police officers arrived, Mrs. Mantyla was dead. Her body was lying on the floor with six bullet wounds in it. The defendant was lying on the body of the deceased with his face against hers. He was bleeding profusely from his head and face and was apparently unconscious. A doctor who later examined the body of the deceased thus described her wounds:

"There were three bullet wounds in the right upper arm. In describing them, one of them looked like a wound that had just been skirted by some passing object. There was one in the left upper arm. There were two bullet wounds in the left side of the chest, one on the line of the arm-pit between the second and third ribs, and one on the line of the arm-pit between the fifth and sixth ribs. There were contusions and lacerations over the left side of the body about the hips and the buttocks. * * * I believe the two wounds on the chest were responsible for the death, probably a perforation of the lungs.

When the defendant was later treated at the emergency hospital, it was found, as testified to by the doctor who gave him first aid, that:

"The man was suffering a great deal from loss of blood and he presented an extensive laceration of the right side of his mouth and the right side of his jaw and a good deal of swelling under the left eye. * * * He had a laceration which tore out the angle of his mouth on the right side, allowing his lower lip to drop. There was a swelling of the eye as though something had been pushed back of the eye. The defendant had no powder marks on his face."

The police officers found at the scene of the tragedy a revolver with six empty cartridges in it lying on the floor. They also found, on a table, a bottle containing a small quantity of whisky. The pistol belonged to the defendant

and was usually kept in a bureau drawer in which the defendant and the deceased kept their clothes.

The defendant was called as a witness in his own behalf, and testified that on the date of the homicide he and Mrs. Mantyla had been drinking intoxicating liquors and that he was drunk. There is considerable other testimony coming from disinterested witnesses which tends to show that the defendant had been drinking intoxicating liquors on the day of the homicide. The defendant further testified that when he sold his pool hall and restaurant he gave Mrs. Mantyla $600 to keep until they could purchase a rooming house; that he had not been paid anything for his work on the farm; that when Mrs. Mantyla leased the Evans apartments he asked her to take the lease jointly in their names, but she refused to do so; that on the night in question the deceased stated that she was going on a trip to Idaho with an Irishman by the name of Kelly; that he told her that she could not go away with the other man unless she paid the money which she owed to the defendant; that thereupon Mrs. Mantyla "became mad and said that she was not going to pay anything for it and went to the bureau drawer and pulled this gun and said 'This is the way I am going to pay.' I was very much scared when I saw her coming with this gun and I went to grab her. Then there was a shot fired. * * * I heard one shot, and after that everything was black. * * * I don't remember what happened after that."

A few days after the homicide a book was found in the kitchen cabinet in the rooms theretofore occupied by the deceased and the defendant. The book contained some writing in the Finnish language, which translated into English reads as follows:

"W Stenbaka

"I have decided that I will do a good deed end Minnie Mantyla and myself because she is such a great harlatan woman I am not crazy but will say farewell to all of you states W. Stenbaka I am doing this deed so you will see that I can suffer all I have suffered very much take notice of W. Stenbak."

Two handwriting expert witnesses were called by the state who, after comparing the writing in the book with the admitted writings of the defendant, expressed it as their opinion that both were written by the same person. The defendant denied that the writing in the book was his.

We have thus set out the substance of the evidence offered at the trial so that the questions of law applicable to such evidence may be more readily discussed and understood.

The defendant relies on two assignments of error for a reversal of the judgment. The defendant requested the court to instruct the jury that:

"It is a general principle of law that intoxication is no excuse for crime, but this general principle has this important qualification or modification, so far as it relates to murder in the first degree. A particular or specific intent is absolutely essential to the commission of this crime, and if the mind of the person doing the killing is unable, because of intoxication, at the time of the killing to form this particular or specific intent, there can be no murder in the first degree, unless the person doing the killing became voluntarily intoxicated for the purpose of killing while intoxicated."

"You are instructed that on the question of the intoxication of the defendant at the time of the alleged killing, if you find from the evidence he was intoxicated, you must be satisfied beyond a reasonable doubt that such intoxication did not incapacitate him from forming a deliberate purpose to kill the deceased; and if you have any reasonable doubt on this question, you must give the prisoner the benefit of such doubt, and find him not guilty of murder in the first degree."

The trial court refused both of the foregoing requested instructions, but gave the following instruction:

"No act committed by a person while intoxicated is less criminal by reason of his having been in such intoxicated condition, but if you find that the defendant was intoxicated at the time of the alleged act, then you may take that fact into consideration in determining as to the intent with which the act was committed. If defendant was capable of conceiving a design, he is presumed, in the absence of proof to the contrary, to have intended the natural consequences of his acts."

While we do not regard the requested instructions which the trial court refused to give as models, the defendant was

entitled to have the substance of those instructions given to the jury. The instruction given by the trial court on the effect of intoxication does not measure up to the requirements of a proper instruction where, as here, intoxication is interposed as a defense to or in mitigation of a charge of murder in the first degree. Our Penal Code, Comp. Laws Utah 1917, provides:

Section 7910: "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act."

Section 8025: "Every murder perpetrated by poison, lying in wait, or any other kind of wilful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed; or perpetrated by any act greatly dangerous to the lives of others and evidencing a depraved mind, regardless of human life,—is murder in the first degree. Any other homicide committed under such circumstances as would have constituted murder at common law is murder in the second degree."

The provisions of our statute just quoted were a part of the Penal Code of the Territory of Utah. Their construction was before the Supreme Court of the United States in the caes of *Hopt* v. *People of State of Utah*, 104 U. S. 631, 632, 26 L. Ed. 873. In that case the defendant requested the trial court to give the following instruction:

"Drunkenness is not an excuse for crime; but as in all cases where a jury find a defendant guilty of murder they have to determine the degree of crime, it becomes necessary for them to inquire as to the state of mind under which he acted, and in the prosecution of such an inquiry his condition as drunk or sober is proper to be considered, where the homicide is not committed by means of poison, lying in wait, or torture; or in the perpetration of or attempt to perpetrate arson, rape, robbery, or burglary. The degree of the offense depends entirely upon the question whether the killing was wilful,

deliberate, and premeditated; and upon that question it is proper for the jury to consider evidence of intoxication, if such there be; not upon the ground that drunkenness renders a criminal act less criminal, or can be received in extenuation or excuse, but upon the ground that the condition of the defendant's mind at the time the act was committed must be inquired after, in order to justly determine the question as to whether his mind was capable of that deliberation or premeditation which, according as they are absent or present, determine the degree of the crime."

The trial court refused to give the requested instruction and such refusal was assigned as error. The Supreme Court of the United States in discussing the foregoing instruction said:

"The instruction requested by the defendant clearly and accurately stated the law applicable to the case; and the refusal to give that instruction, taken in connection with the unqualified instruction actually given, necessarily prejudiced him with the jury."

In the case of *State* v. *Anselmo*, 46 Utah 137, 148 P. 1071, 1079, the late Mr. Justice Frick, writing the opinion for this court, said:

"The court, in effect, should have charged the jury that, while voluntary intoxication was neither an excuse nor a defense, yet, if the jury found that appellant was intoxicated to such an extent that he was mentally incapable of deliberating or premeditating, and to entertain malice aforethought, and to form a specific intent to take the life of the deceased, in such event the jury should not find him guilty of murder in the first degree." To the same effect is *State* v. *Dewey*, 41 Utah 538, 127 P. 275.

In 16 C. J. 107 the law is thus stated:

"The rule that drunkenness is no defense does not apply to the full extent where a specific intent or motive is an essential element of the offense charged. If at the time of the commission of such an offense the accused was by intoxication so entirely deprived of his reason that he did not have the mental capacity to entertain the necessary specific intent which is required to constitute the crime, he must necessarily be acquitted; and in like manner the fact of defendant's drunkenness should be considered in determining the degree of the crime. This is so, not because drunkenness excuses crime but because if the mental status required by law to constitute

crime be one of specific intent or of deliberation and premeditation, and drunkenness excludes the existence of such mental state, then the particular crime charged has not in fact been committed."

Numerous cases dealing with the effect of intoxication as either tending to excuse or mitigate an offense are collected in footnotes to the text just quoted. The cases there cited in the main support the text. There is, as might well be expected, some conflict in the adjudicated cases, but much of the apparent conflict is doubtless due to the difference in the language of the various statutes. Be that as it may, the law in this jurisdiction as to the effect of intoxication in those crimes which require the actual existence of a particular purpose, motive, or intent to constitute a particular species or degree of crime, is settled by the decisions of the Supreme Court of the United States and the decisions of this court which we have heretofore cited. It will be observed in the instruction complained of the jury were informed that if they "found the defendant was intoxicated at the time of the alleged act then you may take that fact into consideration in determining as to the intent with which the act was committed." No mention is made of the law applicable in the event the jury should believe that the mind of the accused was so affected with intoxication that he could not deliberate or premeditate concerning the killing of Mrs. Mantyla or could not entertain malice aforethought. The provisions of Comp. Laws Utah 1917, § 7910, are not limited in their application to the effect that drunkenness may have upon intent. The provisions of that section apply also to purpose and motive. As construed in the cases above cited, the provisions apply to deliberation and premeditation. To constitute a homicide murder in the first degree, there must be present in the mind of the accused not only an intention to take the life of a human being, but such intention must be characterized by premeditation and deliberation. The intention to do an act which is calculated to take the life of a human being is an element common to

the crimes of voluntary manslaughter, murder in the second degree, and murder in the first degree. Which, if any, of the three crimes was committed in a given case depends on the state of the mind under which the accused acted when the homicide was committed. Obviously, if one is unable to perform the mental processes necessary to constitute the crime of murder in the first degree, he cannot be guilty of that crime. It may be that due to intoxication or other causes the mind is so deadened or so bereft of reason that it can neither deliberate nor premeditate and yet the will power may be sufficiently active to form an intent to do an act which results in the death of a human being. The ability to deliberate and premeditate concerning the performance of an act requires a different mental process and may well require a higher degree of mentality than does the ability to form an intent to do an act. And, likewise, the ability to form a particular or specific intent may be lacking and yet there may be sufficient mental capacity to form an intention to do an act which results in death. Indeed, if such were not the case there would be no occasion for the Legislature to provide that "whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act." The Legislature has thus provided that intoxication is a proper subject of inquiry as to purpose, motive, and intent. The trial court was in error in limiting the jury to a consideration of the claimed intoxication of the defendant to his intention at the time he is alleged to have committed the crime charged.

Moreover, the language of the instruction now under review is so general that it would be of but little, if any, aid to the jury in their deliberations. The jury were instructed that if they found the defendant was intoxicated at the time the alleged homicide was committed they "may take that fact into consideration in determin-

ing the intent with which the act was committed." The instruction is silent as to the law applicable to any fact or facts which the jury might find concerning the mental condition of the accused resulting from intoxication. The instruction does not inform the jury as to their duties in the event they should find the defendant was intoxicated at the time of the homicide. The instruction is likewise faulty in that it makes no reference to the extent to which the mind of the accused must have been affected by intoxication before such intoxication could reduce the degree of the crime charged. This court in the cases of *State* v. *Anselmo,* and *State* v. *Dewey,* supra, has clearly indicated the nature of the instructions which should be given where intoxication is an issue in the trial of a person charged with murder in the first degree. The instruction under review does not meet the requirements of the law announced in those cases.

Some members of this court entertain the view that the evidence tending to show that the defendant's mind was affected by intoxication at the time of the alleged crime is such that he was not entitled to any instruction on the law applicable to intoxication, and hence no prejudicial error was committed in giving the instruction complained of. The learned trial judge must have taken a different view, otherwise he would not have submitted that question to the jury. We are of the opinion that the evidence tending to show that the mind of the accused was affected by the excessive use of intoxicating liquors at the time of the alleged crime was sufficient to entitle him to a proper instruction on the law applicable to intoxication. There can be no doubt that the defendant had been drinking intoxicating liquor on the day the homicide was committed. Mrs. Everett testified that she met Mrs. Mantyla on Main street in Salt Lake City at about 8:30 p.m. on the day of the tragedy; that Mrs. Mantyla said to her that Mr. Stenback "had been drinking and that he had taken her money to buy whisky to drink and that her first husband had drunk a lot and she was not going

to stand for another man to spend her money that she had for her children. * * * " Mrs. Everett further testified that when she called for the key to her apartment a short time before the shooting occurred she smelled the fumes of intoxicating liquor on the breath of the defendant. J. W. Arbuckle testified that he saw the defendant between 6 and 7 o'clock on the evening of the day in question and that he noticed the odor of intoxicating liquor on his breath. Arne Mantyla, a son of the deceased, testified that he was in the apartment occupied by the defendant and his mother at about 9 o'clock p.m. on the day that his mother was killed; that he observed the odor of intoxicating liquor on defendant's breath; that he asked his mother where Stenback had been drinking, but his mother made no reply. Officer D. H. Clayton testified that the breath of the defendant smelled of intoxicating liquor at the time he was receiving first aid at the hospital. The defendant testified that he began drinking moonshine liquor in the forenoon of the day in question; that he was drinking during the day and evening of that day; and that Mrs. Mantyla also drank some; that he did not know who killed the deceased or how she was killed. On cross-examination he testified that he was drunk.

Aside from the evidence relating to the intoxication of the defendant at the time the homicide was committed, there is evidence that just before the deceased was killed the defendant was shot and seriously wounded in the face and head, and that as a result he did not know what occurred thereafter. The defendant so testified. That the defendant was seriously wounded is established beyond controversy. There is ample evidence independent of the testimony of the defendant that his mind was seriously affected immediately after the homicide was committed. When he opened the door immediately after the shots were fired, he merely said, "Just a minute, just a minute," and then closed the door again. When the officers arrived the defendant seemed to be unconscious. The doctor who gave him first aid testified that while he was caring for his injury "he

was mumbling somewhat. * * * For the most part his conversation was unintelligible. * * * " A nurse who assisted the doctor in giving him first aid testified that he was in a terrible condition and that he kept saying: "Yah, mine wife. * * * He jabbered something else, but I don't know what it was." To the same effect is the testimony of the officers who interrogated him immediately after the homicide. It may be argued that the condition of the defendant's mind at the time he was giving first aid was brought about by his injury, and not by the excessive use of intoxicating liquors. It may be further urged that the defendant did not receive his injury until after the homicide was committed. Such arguments might well be addressed to the jury who are to determine the facts, but it cannot be said as a matter of law that the unconscious or semiunconscious condition of the defendant immediately after the homicide was caused in whole or in part by the injury which he received. Much less can it be said that as a matter of law the defendant received his injury after and not before the homicide was committed. Both questions are clearly questions of fact. If the defendant received his injury before the homicide, and as a result of such injury alone, or in connection with his intoxicated condition, his mind was so affected that he could not deliberate or could not premeditate or could not form the specific intent to kill Mrs. Mantyla, then and in such case he is not guilty of murder in the first degree unless he meditated and deliberated upon the killing and formed the necessary intent before his mind became affected. The condition of defendant's state of mind as a result of intoxication or injury, or both, at the time of the alleged crime was an issue in the case. No proper instruction submitting that issue to the jury was given, and as a result the jury was not properly advised as to the law applicable to the evidence upon that issue.

Defendant also complains because the trial court gave the following instructions:

"You are instructed that the law requires that the killing, in order to constitute murder in the first degree, must be perpetrated 'from

a premeditated design' with a specific intent to take life; still it does not require that such premeditated design shall exist in the mind of the perpetrator for any fixed period of time before the doing of the act which constitutes the crime. If there were such a design and determination to kill, deliberately formed in the mind, at any moment before the fatal act was done, it is sufficient.

"The term 'malice or malicious' import a wish to vex, or annoy, or injure another person, or any intent to do a wrongful act, established either by proof, or by presumption of law.

"The term 'wilfully' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act or make the omission referred to, it does not require any intent to violate law, or injure another or to acquire any advantage.

"You are instructed that it is not necessary that malice, wilful intent, premeditation, or deliberation should have entered into the mind of the defendant for any length of time before the killing took place. It is sufficient if there was a design and determination to kill distinctly formed in the mind at any moment before the act was committed, no matter how brief that space of time may have been. And in this case, if you believe from the evidence beyond a reasonable doubt that the defendant feloniously shot and killed Minnie Mantyla, as charged in the information, and that before the shot or shots were fired, no matter how brief or short the space of time before, had formed in his mind a wilful, malicious, deliberate and premeditated design or purpose to take the life of the deceased, and that the shot was fired in furtherance of that design, or purpose, and without any justifiable cause or legal excuse therefor, as explained to you in these instructions, then you should find the defendant guilty of murder in the first degree."

No objection or exceptions were taken at the trial to the instructions now complained of, but it is claimed that the instructions were brought to the attention of the trial court at the time of the hearing of the motion for a new trial. The complaint urged against the foregoing instructions is that the court informed the jury that no appreciable time was necessary for premeditation and deliberation to constitute a homicide murder in the first degree. It will be noted that in one of the instructions the court informed the jury that, "if there was such a design and determination to kill, deliberately formed in the mind, at any moment before the fatal act was done, it is sufficient," and in the

other that, "if you believe from the evidence beyond a reasonable doubt that the defendant feloniously shot and killed Minnie Mantyla as charged in the information and that before the shot or shots were fired, no matter how brief or short the space of time before," etc. The defendant contends that the foregoing instructions offend against the rule of law announced by this court in the case of *State* v. *Anselmo*, supra. The instruction there condemned was that "there need be no appreciable space of time between the intention to kill and the act of killing; they may be as instantaneous as the successive thoughts of the mind." While the language used in the instructions complained of in the instant case may be somewhat less objectionable than the language used in the Anselmo Case, the rule of law that condemned the instruction in the Anselmo Case must disapprove the instruction complained of in the instant case.

The time required for premeditation and deliberation is not a question of law, but it is a question of fact to be determined by the jury. The law does not and cannot justly fix such time. It may differ greatly in individuals, and it may also differ greatly in the same person at different times under different circumstances. The court should not by its instructions indicate to the jury the length of time that is required for deliberation or premeditation any more than it should indicate its views as to any other fact which is in issue. We repeat what is said in the Anselmo Case:

"That the courts should not attempt to fix or prescribe any time, but should submit the question of whether the killing in question was committed with premeditation and deliberation to the jury. * * *"

In this connection we observe that nowhere in the instructions given to the jury did the trial court define deliberation or premeditation. To constitute first degree murder it is not enough to show an unlawful, intentional, and malicious killing. Premeditation and deliberation must also be present. It is of vital concern to the defendant and to the state that the jury be instructed as to

the meaning of these terms, because unless they are understood the jury cannot intelligently distinguish murder in the first degree from murder in the second degree. The jury should have been instructed as to the meaning of these terms, because it cannot be assumed that a jury of laymen fully understand their meaning as applied to first degree murder.

During the course of the examination in chief of 12,13 the defendant, he was asked this question:

"Q. Did you at any time that night or at any other time intend to kill Mrs. Mantyla?"

The attorney for the state objected to the question as "immaterial and irrelevant." The court sustained the objection. This ruling of the trial court is not assigned as error and is not argued, yet this court, in a capital case such as this, may and should sua sponte consider manifest and prejudicial errors which are neither assigned nor argued. *State* v. *Riley*, 41 Utah 225, 126 P. 294. The defendant should have been permitted to answer the question thus propounded.

The question of whether the defendant did or did not intend to kill the deceased goes to the very essence of the crime charged.

"In every crime or public offense, there must exist a union or joint operation of act and intent, or criminal negligence." Comp. Laws Utah 1917, § 7908.

The intention to take the life of Mrs. Mantyla is as essential an element of the crime of murder in the first degree as is the killing itself. We quote the following from Jones Commentaries on Evidence (2d Ed.) vol. 2, § 713, pp. 1336, 1337:

"Now that defendants are permitted to testify in their own behalf, there can be no valid reason assigned why they should not be allowed to testify to the intent with which any act was done, where such intent is a fact necessary to be ascertained."

This court has held the law to be as stated by the author just quoted. *Conway* v. *Clinton*, 1 Utah 215; *People* v. *Monk*, 8 Utah 35, 28 P. 1175; *State* v. *Sawyer*, 54 Utah 275, 182 P. 206. In the Sawyer Case the defendant was charged with the crime of grand larceny—that of stealing a steer. In the course of the trial the defendant was asked a number of questions relating to whether or not he believed the animal alleged to have been stolen was his property. He was permitted to answer some of those questions, but objections were made and sustained as to others. This court held that whenever the intent of the accused is relevant to the issue or becomes material to the act charged he may testify as to his own motive or intent, and that it is ordinarily reversible error to deny an accused the right to so testify. It was further held that the ruling complained of was not reversible error because the accused had, during the progress of the trial and without objection, answered other questions which were very similar to the questions which he was not permitted to answer. In the instant case the defendant was not asked any question which may be said to be similar to the question which the court erroneously refused to permit him to answer. The defendant did testify that when he was shot everything went black and that he did not remember what occurred thereafter. But such testimony cannot be said to be equivalent to direct and positive testimony that the defendant did not intend to kill the deceased. It was apparently the theory of the prosecution that the defendant determined to kill Mrs. Mantyla before the night of the homicide. The writing in the book, if the jury believed it was written by the defendant, tends to support such theory. If the jury believed that the defendant had formed a fixed purpose to kill the deceased at some time before the day of the homicide, they may have found him guilty of murder in the first degree even though they might have believed his statement that he was shot and that everything went black when the homicide was committed. The fact that the defendant testified that he was shot before the homicide and that he did not

know what occurred thereafter cannot be said to be the equivalent to testimony that he did not intend to kill the deceased. The defendant was also permitted to testify that he had never threatened or said that he would kill the deceased. Obviously, such testimony is not in any sense equivalent to a statement that he never intended to kill the deceased. The most that can be said of the testimony which the defendant was permitted to give is that an inference may be drawn therefrom, if believed, that he did not intend to kill the deceased. Certainly it cannot be said as a matter of law that an inference which may be drawn from testimony has the same weight with a jury as does direct and positive testimony concerning the fact itself. Courts of justice should be ever mindful that one charged with a public offense is given a fair trial according to established rules of law, and especially is this so where, as here, the life of the accused is at stake. An error which is so manifest and so calculated to be prejudicial to the rights of the defendant as was the refusal of the court to permit him to testify as to whether he did or did not intend to kill the deceased may not justly be brushed aside by the statement that the error was not prejudicial.

Because of the errors indicated the defendant was not given a fair trial and the judgment should be, and it accordingly is, reversed. The cause is remanded to the District Court of Salt Lake County with directions to grant a new trial.

STRAUP and EPHRAIM HANSON, JJ., concur.

CHERRY, C. J.

I dissent. The statement of facts in the prevailing opinion is not as full and complete as is necessary to a proper understanding of the case; hence I insert one of my own.

Defendant is a native of Finland. He came to the United States in 1914 and to Utah in 1927. At the time of the trial he was 42 years of age. Minnie Mantyla was a

widow with several children, residing on a small farm near Salt Lake City. At the time of her death she was about 45 years of age. She also was a Finn and spoke the language. The defendant became acquainted with her shortly after his arrival in Utah, and in August, 1928, commenced to cohabit with her in the relation of husband and wife, though not married, at her farm. About April 1, 1929, Minnie Mantyla rented an apartment or rooming house called the Evans Apartments, on State street in Salt Lake City, and removed there to conduct a rooming house business. The defendant accompanied her and continued his relations with her. They occupied a suite of two rooms, called apartment No. 3, situated on the second floor of the building. The defendant was addicted to gambling and the use of intoxicating liquors, and he had previously conducted a pool hall in Salt Lake City on his own account. There was evidence of some little disagreement between the defendant and Minnie Mantyla over his drinking habits and the collection by him of rent from one of her roomers. This, however, was not serious. Apparently they were on good terms with each other. The homicide charged occurred on May 18, 1929. On that day it appeared that the defendant was drinking liquor to some extent. Early in the afternoon he accompanied Minnie Mantyla to a store to make some purchases. Later he was seen playing cards in a pool hall. A witness saw him buy $20 worth of chips in a card game and lose them. It was proved that in the evening he went to one of the roomers of the rooming house and collected $5 rent. Prior to that time Minnie Mantyla had always collected the rent. It was also shown that the defendant left the apartments in the evening to go to a barber shop, and again went out to buy cigarettes. Minnie Mantyla was seen on Main street at about 8:30 o'clock in the evening, by two of her roomers. From them she borrowed their key to use in opening the door of her own apartment, stating that the defendant had her key. At about 9 o'clock a married son of Mrs. Mantyla, with his wife and daughter, called at apartment No. 3 and spent a short time there with the

defendant and Mrs. Mantyla. After they left and about 9:45 o'clock, the two roomers, Mr. and Mrs. Everett, who occupied rooms on the third floor, and who had lent their door key to Mrs. Mantyla, called at apartment No. 3 for their key. Minnie Mantyla and the defendant were there present and on apparently good terms with each other. They invited Mr. and Mrs. Everett to stay for lunch and coffee, but the invitation was declined. The Everetts thereupon went to their rooms on the third floor and a few minutes later heard several pistol shots in quick succession and screams of a woman. They hurried down to apartment No. 3 and knocked repeatedly on the door. The defendant, after a short time, unlocked and opened the door, from the inside, and said, "Wait a minute, wait a minute." He was bleeding from the mouth and had blood on his clothes. He shut the door. Mr. and Mrs. Everett returned to their own apartment and called the police. In a short time police officers arrived and entered apartment No. 3, and found Minnie Mantyla lying dead on the floor with numerous bullet wounds in her arms and body, and with contusions and lacerations over the left side of the body about the hips and buttocks. The defendant was lying on the body of the dead woman with his face against hers. He was bleeding profusely from his head and face and was apparently unconscious. He had apparently been shot in the mouth and the bullet had come out through or lodged behind the left eye. A Smith & Wesson 38-caliber revolver which the defendant had purchased a year before, with six empty cartridges in it, was lying on the floor. A pint bottle, two-thirds full of whisky, was found on a chair or settee in a corner of the room. The dead body of the woman was taken to the city morgue, and the defendant was taken to the Emergency Hospital. The doctor who examined the defendant said that he had a laceration which tore out the angle of his mouth on one side, allowing his lower lip to drop; that he was bleeding profusely, and mumbling something unintelligible to the doctor; that some one asked him something about his wife; that the defendant mumbled some-

thing about his wife, but that the witness was not able to make out what the defendant was trying to say.

The chief of detectives testified that he was at the emergency hospital when the defendant was being examined by the doctor; that the defendant was bleeding profusely from the mouth, and that the witness wiped the blood from his mouth repeatedly; that the defendant said: "Where is my wife? I want my wife." That the witness said, "She is dead," and then asked, "Who shot Mrs. Mantyla, and you?" and the defendant replied, "I did." Another police officer named Ramsey testified that while the defendant was lying on the operating table at the emergency hospital and before the arrival of the doctor, he heard Officer Applegren ask the defendant if he shot the lady, and that the defendant replied, "Yes, I shot her." Another witness stated that he was present at the emergency hospital when the doctor was examining and treating the defendant. That the witness asked the doctor what caliber gun did the injury, and the defendant voluntarily answered by saying "38 caliber." A nurse called by the defendant testified that she was present at the emergency hospital assisting the doctor in caring for the defendant. That she heard the defendant speaking. That the only thing she heard him say that she could understand was, "Yah, mine wife, mine wife." That he jabbered something else which she could not understand. That the detectives asked him numerous questions, and he answered, "Yah," to everything.

On the night of and after the homicide, the chief of detectives found an account book lying on the kitchen cabinet in the apartment where the tragedy occurred, on the front of the last leaf of which was certain writing in the Finnish language. Several witnesses testified that the handwriting was that of the defendant. Translated into English, the writing was as follows:

"I have decided that I will do a good deed end Minnie Mantyla and myself because she is such a great harlatan woman I am not crazy but will say farewell to all of you states W. Stenbaka I am doing

this deed so you will see that I can suffer all I have suffered very much take notice of W. Stenbak."

The defendant was a witness at the trial in his own behalf. He testified that he was 42 years old; that he came to the United States from Finland in 1914; and worked in Minnesota, South Dakota, Montana, Washington, and Idaho, in logging camps and mines and on farms from time to time, until December, 1927, when he came to Salt Lake City, where he purchased a half interest in a restaurant and pool hall. While operating the same he met Minnie Mantyla and commenced associating with her. He saw her nearly every week, and she sometimes spent the night with him in his room. About August 1, 1928, he sold his interest in the pool hall, and went to live with Minnie Mantyla at her farm near Salt Lake City. At that time he loaned or gave her for safe-keeping something over $500. In April, 1929, Minnie Mantyla purchased the Evans Apartments at Salt Lake City, to which place they both removed and took up their residence. The defendant in his examination in chief gave a minute and detailed account of the conduct and actions of both himself and Minnie Mantyla during the day when the homicide occurred, and up to the time when the shooting commenced. His version of the tragedy was that when he and the deceased were alone in their apartment, she told him of her intention to go on an excursion to Idaho with a man named Kelly. That he (the defendant) told her she could not go until she had paid him the money she owed him. That after some further words between them, she took the pistol from a bureau drawer and pointing it at him said, "Here is the way I am going to pay you." That he said, "You are crazy," and grabbed for the gun, but got a shot, and that thereafter everything was black, and he could not remember anything until he was down at the county hospital a day or two later. He said he did not remember writing the matter in the account book in the Finnish language above referred to, and knew nothing about it. In his examination in chief he said he

had been drinking during the day, but did not say that he was intoxicated and did not claim that he was incapacitated on that account. The only reference in the evidence to the subject of intoxication occurred during his cross-examination, and is embraced in the following questions and answers, viz.:

"Q. Were you drunk so that you did not know what you were doing when Mrs. Mantyla was killed? A. We had been drinking.

"Q. I am not asking that. Answer the question yes or no. A. Yes, I was drunk.

"Q. Did you know what you were doing? A. I did not do anything.

"Q. Well, then, you were not so drunk: you know that you did not do anything? A. I remember I was not doing anything.

"Q. I say you remember going over and taking hold of Mrs. Mantyla's hand, didn't you, when she had the gun? A. Yes.

"Q. Well, then, you do remember something, don't you? A. Yes.

"Q. Then you were not so drunk that you did not remember anything, were you? A. No, I was not so drunk."

The defendant further stated that he could remember lots of things that occurred, but could not account for every minute. He gave a particular account of his actions during the day and evening and up to the time when he said the first shot was fired, after which time he said everything was black.

It is not claimed that the evidence is insufficient to support the verdict. The assignments of error are:

(1) That "the court erred in denying appellant's requests for instructions Nos. 3 to 15 inclusive." And (2) that "the court erred in denying appellant's motion for a new trial."

Under his first assignment, counsel for appellant complains of the court's refusal to give but two of his requested instructions, and these relate to the subject of intoxication and are as follows:

Request No. 4. "It is a general principle of law that intoxication is no excuse for crime, but this general principle has this important qualification or modification, so far as it relates to murder in the first degree. A particular or specific intent is absolutely essential to the commission of this crime, and if the mind of the person doing

the killing is unable, because of intoxication, at the time of the killing to form this particular or specific intent, there can be no murder in the first degree, unless the person doing the killing became voluntarily intoxicated for the purpose of killing while intoxicated."

Request No. 5. "You are instructed that on the question of the intoxication of the defendant at the time of the alleged killing, if you find from the evidence he was intoxicated, you must be satisfied beyond a reasonable doubt that such intoxication did not incapacitate him from forming a deliberate purpose to kill the deceased; and if you have any reasonable doubt on this question, you must give the prisoner the benefit of such doubt, and find him not guilty of murder in the first degree."

Concerning intoxication, the court charged the jury substantially in the language of Comp. Laws Utah 1917, § 7910, as follows:

"No act committed by a person while intoxicated is less criminal by reason of his having been in such intoxicated condition, but if you find that the defendant was intoxicated at the time of the alleged act, then you may take that fact into consideration in determining as to the intent with which the act was committed. If defendant was capable of conceiving a design, he is presumed, in absence of proof to the contrary, to have intended the natural consequences of his act."

No exception was taken to the giving of this instruction. The contention is that the law respecting intoxication and its bearing upon premeditation, deliberation, and intent was not fully or completely stated to the jury or the instruction given, and that error was committed in that regard by the refusal to give the instructions requested by the defendant. It is not claimed that the instruction given contained anything erroneous, but that it omitted to charge that intoxication was a matter to be considered in determining whether the defendant had the capacity to and did premeditate and deliberate upon the homicide. In this regard it is insisted that the decisions of this court in State v. Dewey, 41 Utah 538, 127 P. 275, and State v. Anselmo, 46 Utah 137, 148 P. 1071, lay down standards of instructions upon the subject which were not observed

in the present case. It is not necessary here to review the cases cited or to inquire into the question of what particular instructions concerning intoxication are required in a proper case, for the reason that in this case the matter of intoxication was so unimportant and the evidence of it so slight, that no reversible error would have resulted had no reference been made to the subject at all. As heretofore stated, the defendant never claimed at any time that he was mentally incapacitated by intoxication, and no other witness testified to any fact or opinion from which it could be inferred that the defendant was intoxicated on the day of the homicide. On the contrary, the testimony of the defendant himself is clearly to the effect that up to the time of the actual shooting he was in the possession of his normal mental faculties. This is evident by his particular and detailed account of the movements and actions and conversation of both himself and the deceased during the whole of the day and up to the moment when the first shot was fired, at which time he says that everything turned black. According to his own testimony, he knew and remembered that in the forenoon he cleaned the hallway and heated the water for the bathrooms. That he and the "Mrs." made some punch and did some drinking. That along in the afternoon they went to several stores where Mrs. Mantyla was making some purchases and returned to the apartment about 4 o'clock. That about 6 o'clock he went to a barber shop and returned in half an hour. That about 6 o'clock Mrs. Mantyla's son Arne and wife came to the apartment and in a short time left. That Mrs. Mantyla left the apartment about 7 or 8 o'clock. That between 7 and 8 o'clock he collected $5 rent from roomers on the third floor and gave a receipt for it. That about 8 o'clock he went out to buy cigarettes and stepped into a hotel and pool hall, and returned to the apartment. At this time Mrs. Mantyla had returned to the apartment. That about 9 o'clock Arne Mantyla returned to the apartment and brought a half gallon of liquor with him. That at Mrs. Mantyla's request defendant took the

jug of liquor upstairs to room No. 10 and left it. That Arne wanted money for the liquor which he brought. That he asked for it a second time. That defendant took from his pocket a $5 bill he had collected for rent, and Mrs. Mantyla took it away from him. That Arne left shortly thereafter. That Mr. and Mrs. Everett called in about the same time for a few minutes and then went upstairs. That he and Mrs. Mantyla were left alone. He said they were drinking coffee and coffee punch. He gave a detailed account of their quarrel over her intention to go away with another man and his demand for the money he claimed she owed him. He described how she took the gun from a particular bureau drawer, and holding it in her right hand, pointed it at him and said, "Here is how I will pay you." That he said, "You are crazy," and grabbed for the gun, when he got a shot and everything turned black. His own conduct as described by himself is utterly inconsistent with any claim of incapacity on account of drunkenness. While it is true that on cross-examination he stated that he was drunk, his subsequent answers destroyed the force of the statement, and left the proof of intoxication so slight and inconsiderable as to justify ignoring it entirely.

A very similar situation arose in State v. Cerar, 60 Utah 208, 207 P. 597, 600, wherein this court said:

"It is further contended that the court's instruction on intoxication was erroneous in that it was not sufficiently specific in certain particulars, and further, that it did not conform to what is said upon that subject by this court in State v. Dewey, 41 Utah 538, 127 P. 275, and State v. Anselmo, 46 Utah 137, 148 P. 1071. In State v. Dewey, supra, the court's charge on the effect of intoxication in a criminal case was held to be narrower than the statute, and for that reason was held erroneous. True, it was there also held that the charge on the effect of intoxication in capital cases should be explicit and in such language as to aid the jury in arriving at a correct conclusion upon the elements of premeditation and deliberation, which are always present in such cases. To the same effect is the case of State v. Anselmo, supra. A mere cursory reading of those cases, however, will disclose that they are exceptional and peculiar with respect to the facts and circumstances there involved. In the Dewey Case the intoxication of the accused was of such an extreme and protracted nature that it

had developed into delirium tremens, while in the Anselmo Case the evidence was to the effect that the accused from childhood had been afflicted with epilepsy, and that his relatives and ancestors had been so afflicted, and that the use of intoxicating liquors had an unusual and extraordinary effect upon his mind. These cases are therefore clearly distinguishable from ordinary cases of intoxication. While we adhere to the rule laid down in the two cases just referred to, yet where the evidence of intoxication is of that meager and unsatisfactory character, which it is in this case, and where the jury would have been justified in finding that the intoxication of appellant, if under the influence of liquor at the time the alleged offense was committed was nevertheless, not of that character which would afford any excuse whatever, the case is quite different. We are of the opinion, therefore, that although the instruction upon the question of intoxication was couched in general terms merely, it was nevertheless, sufficient in view of all the facts and circumstances in this case, and that the jury were not misled. To reverse the judgment in this case upon the ground that the charge upon intoxication constituted prejudicial error would require us to assume prejudice where, in view of the whole record, none is made apparent. Indeed, it would be, in one view, a travesty of justice."

This rule is stated in C. J. as follows:

"An instruction on intoxication may be refused where there is no, or not sufficient, evidence that defendant was intoxicated at the time of the crime. * * * An instruction as to intoxication is also erroneous if it is confusing or misleading or if it singles out or lays undue emphasis on the fact of intoxication apart from the other proof." 30 C. J. 362.

In *People* v. *Price*, 207 Cal. 131, 277 P. 316, a case in some of its aspects very similar to the one before us, the Supreme Court of California said:

"Both of appellant's contentions are based upon his position that he was intoxicated at the time the crime was committed, and that he was incapable, therefore, of premeditation. We have examined the record in the case, and find that it supports the verdict of murder in the first degree. It is true that the record shows defendant had been drinking intoxicating liquor just prior to the commission of the crime, and that he was under its influence, to some extent at least, when he fired the shots at his victim; but this fact furnishes no legal excuse. Section 22, Pen. Code. The evidence shows that, for

several years, the defendant had been living with Maurillia Adame. She had previously been married, and was the mother of two children by this marriage. She was generally reputed to have been the wife of defendant, although they were not legally married. Defendant, according to some of the testimony, was engaged in the illegal sale of intoxicating liquor, and, according to his own account, he had been confined in jail for a time shortly before the crime we are considering was committed, for drunkenness. After his release, Maurillia Adame left him and went to live in another apartment. Defendant watched her movements and associations, telephoned to her, and attempted to persuade her to return to him. Upon her refusal, he secured a revolver from one of his associates, by representing that he could sell it at a good price. He then wrote a letter to the men with whom he was living, in which he stated: 'When you come home, you may find me in the can (meaning jail). * * * I hope you will bring something to smoke. * * * Come down and see me. I may want you to bring some clothes back. * * * I have a watch. You come down. I will tell you where it is.' He then wrote to Maurillia Adame: 'I ask you to come to me, but would not listen to me. It is too late now. I love you more than any one; so goodby.' The deceased was working in a laundry, and defendant came up to her on the street, as she was leaving for her luncheon. He had obtained some whisky that morning and had consumed some of it. At the time this was done, however, his plans seem to have been very definitely made.

"The provision of section 22 of the Penal Code, to the effect that, when purpose, motive, and intent is a necessary element to constitute the degree of crime, the jury may take into consideration the fact of intoxication in determining the purpose, motive, and intent with which the act was committed, is inapplicable here, because, as stated by the trial judge, there was no evidence of intoxication, and no claim made by the defendant that he was intoxicated at the time he planned or executed the crime. It is true, as considered by the trial court, that the defendant said he had drunk some whisky in the morning, and that the detective said he showed evidence of drinking at the time he was brought to the police station, but the claim of defendant at the trial was that he had secured a revolver for the purpose of committing suicide, and that he had started out at noon to send a note to the deceased, and had accidentally met her on the street; that he attempted to hand her the note, and she repulsed him in a manner which so angered and distracted him that, in a sudden rage, he shot her. This theory of the defense was before the jury, and they rejected it. There was insufficient evidence in the record regarding intoxication to warrant the giving of the instruction on this subject requested by the defendant."

No reversible error was committed by refusing to give defendant's requested instructions upon the subject of intoxication.

Under the second assignment of error, appellant's counsel presents objections to the instructions given by the trial court to the jury concerning premeditation and deliberation. The instructions complained of are as follows:

No. 8. "You are instructed that the law requires that the killing, in order to constitute murder in the first degree, must be perpetrated 'From a premeditated design,' with a specific intent to take life; still it does not require that such premeditated design shall exist in the mind of the perpetrator for any fixed period of time before the doing of the act which constitutes the crime. If there was such a design and determination to kill, deliberately formed in the mind, at any moment before the fatal act was done, it is sufficient.

"The terms 'malice or malicious' import a wish to vex, or annoy, or injure another person, or any intent to do a wrongful act, established either by proof, or by presumption of law.

"The terms 'wilfully' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act or make the omission referred to, it does not require any intent to violate law, or injure another or to acquire any advantage."

No. 17. "You are instructed that it is not necessary that malice, wilful intent, premeditation, or deliberation should have entered into the mind of the defendant for any length of time before the killing took place. It is sufficient if there was a design and determination to kill distinctly formed in the mind at any moment before the act was committed, no matter how brief that space of time may have been. And in this case, if you believe from the evidence beyond a reasonable doubt that the defendant feloniously shot and killed Minnie Mantyla, as charged in the information, and that before the shot or shots were fired, no matter how brief or short the space of time before, had formed in his mind a wilful, malicious, deliberate, and premeditated design or purpose to take the life of the deceased, and that the shot was fired in furtherance of that design, or purpose, and without any justifiable cause or legal excuse therefor, as explained to you in these instructions, then you should find the defendant guilty of murder in the first degree."

No exception was taken at the trial to either instruction, and the objections are argued here under an assignment of error "that the court erred in denying appellant's motion

for a new trial." Were this not a capital case with a sentence of death, the matter would be disregarded for lack of exceptions and assignments of error.

There is no validity, however, in the objections. The complaint is that error was committed in defining the time which must ensue between premeditation and the act of killing, and, again, appellant relies upon what was said by this court upon the subject in *State* v. *Anselmo,* supra. In the Anselmo Case the court held it erroneous to instruct that "there need be no appreciable space of time between the intention to kill and the act of killing; they may be as instantaneous as the successive thoughts of the mind." The Anselmo Case involved facts of an exceptional nature, and the decision was not unanimous. Still, the prevailing opinion in that case does not condemn as erroneous the instructions complained of here. The majority opinion there announced the correct doctrine to be that no fixed or definite time for premeditation is necessary, but that it must precede the killing by some appreciable space of time, however brief, sufficient for reflection and consideration, and the formulation of a definite purpose to kill.

To instruct that to constitute murder in the first degree the killing must be perpetrated from a premeditated design and with a specific intent to take life, but that such premeditated design need not exist for any fixed period of time, but is sufficient if deliberately formed in the mind at any moment however brief before the fatal act, and to say concretely, as was done in this case, that if the accused shot and killed the deceased, and that before the shots were fired, no matter how brief or short the space of time before had formed in his mind a wilful, malicious, deliberate, and premeditated design or purpose to take the life of the deceased, and that the shot was fired in furtherance of that design or purpose, and without any justifiable cause or legal excuse therefor, he should be found guilty of murder in the first degree, states the law as substantially laid down in the Anselmo Case, and is free from any legal error so far as concerns the question of the time which premedita-

tion or deliberation must precede the act of killing. The authorities quoted in the Anselmo Case fully sustain this proposition. Further reference to legal authority is unnecessary.

A further question, not assigned as error, nor mentioned in the briefs or oral arguments, is thought deserving of consideration by the majority of this court. In the examination in chief of the defendant as a witness in his own behalf, he was asked by his counsel, "Did you at any time that night, or at any other time intend to kill Mrs. Mantyla?" An objection by the district attorney that the question was immaterial and irrelevant was sustained by the court. The defendant then testified that he had never threatened or said that he would kill the deceased and that he did not know how or who shot her, if she had been shot.

While, under the weight of authority, the defendant should have been allowed to answer the question objected to, the error is not one that requires a reversal of the judgment. The defendant testified to facts, which amounted to a denial of both the intent and fact of the killing. For him to have further testified that he did not intend to kill her would have added nothing substantial to his testimony. If the jury had believed what he testified to, he would not have been convicted.

A person accused of crime is by the Constitution and laws of this state surrounded with ample safeguards to protect him from oppression and injustice, and it is the duty of courts to secure to him his rights and see to it that he has a fair trial, according to the forms of law. But that duty is fulfilled when his substantial rights have been preserved. If convictions are to be reversed and set aside because of formal or technical errors, plainly not affecting the substantial rights of the accused or the result of the trial, the enlightened judicial opinion of the times must be defied and the express provision of our own statutes ignored. Comp. Laws Utah 1917, § 9231, provides:

"After hearing an appeal, the court must give judgment without regard to errors or defects which have not resulted in a miscarriage

of justice. If error has been committed it shall not be presumed to have resulted in a miscarriage of justice. The court must be satisfied that it has that effect before it is warranted in reversing the judgment."

In this case there was no error of a substantial nature. The defendant had a fair trial. The evidence of his guilt was ample and convincing. There appears to be no miscarriage of justice.

The judgment should be affirmed.

FOLLAND, J.

I concur in the views expressed by Mr. Chief Justice CHERRY in his dissenting opinion.